No. 85-95

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

MICHAEL RIX,

Plaintiff and Appellant,

-vs-

GENERAL MOTORS CORPORATION,

Defendant and Respondent.

_____

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kelly & Halverson, P.C.; Billings, Montana
Patrick Prindle argued, San Diego, California

For Respondent:

Moulton, Bellingham, Longo & Mather; Randy H.
Bellingham argued, Billings, Montana

_____

Submitted: April 8, 1986

Decided: July 21, 1986

Filed: JUL 21 1986

_____
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

In 1978, Michael Rix was injured when the pickup he was driving was hit from behind by a 1978 General Motors Corporation (GMC) two ton chassis-cab, which had been equipped with a water tank after sale by the GMC dealer. Plaintiff sued GMC on a theory of strict liability in the Yellowstone County District Court. Following a jury verdict for GMC, plaintiff appeals. We reverse and remand for new trial.

Issues

1. Did the trial court properly instruct the jury on strict liability?

2. Is Rule 407, M.R.Evid., applicable to products liability under a strict liability theory, thus making evidence of subsequent design changes not admissible?

3. Did the District Court abuse its discretion by excluding disputed conversations between two insurance adjusters?

4. Is res ipsa loquitur applicable to products liability under a strict liability theory?

5. Did the District Court abuse its discretion by admitting GMC's cross-examination of Dan Williams?

6. Did the District Court abuse its discretion by refusing to compel GMC to further supplement its discovery responses?

The pertinent portion of the revised pretrial order contained the following stipulated facts:

> 1. That on the 4th day of August, 1978, on the Shepherd Road, near mile post number 1, in the County of Yellowstone, State of Montana, JOHN STANLEY FISHER was driving a 1978 GMC, two ton chassis-cab equipped with a water tank when it collided with the rear of the 1968 GMC pickup truck

2

being operated by MICHAEL RIX and in which Michael Eaton was a passenger.

2. That at the time and date of the . . . accident, the 1978 GMC two ton chassis-cab equipped with a water tank was 4-6 weeks old, having been purchased and delivery taken on or about June 28, 1978.

3. GENERAL MOTORS CORPORATION designed, manufactured in part, assembled, and sold the certain 1978 two ton chassis-cab . . .

4. [G]ENERAL MOTORS CORPORATION designed, manufactured in part, and assembled the . . . vehicle at its plant in Pontiac, Michigan.

5. That on or about May 25, 1978, Town and Country GMC, an authorized dealer of General Motors Corporation took delivery of the aforesaid chassis-cab at the Silverdome in Pontiac, Michigan, and brought it to Billings.

6. The failure of a brake line carrying hydraulic fluid was a cause of the brake failure occurring on the aforesaid vehicle on August 4, 1978.

7. The 1978 two ton chassis-cab. . . was equipped with a single brake system offered as the standard system and not a split (dual) system.

8. At the time the . . . 1978 two ton chassis-cab . . . was designed, manufactured in part, and assembled, . . . GENERAL MOTORS CORPORATION had the knowledge, capacity, and capability to incorporate a split (dual) brake system, and in fact did so as optional equipment, if ordered by purchaser. . .

Plaintiff contends he was injured by an unreasonably dangerous 1978 two ton chassis-cab, which had been placed in the stream of commerce by GMC. Premised on a theory of strict liability, he maintains the product was unreasonably dangerous because of both manufacturing and design defects.

The parties stipulated that the accident occurred because of brake failure. Expert testimony from both parties established that the fluids necessary to the braking system had escaped when a brake tube came out of a nut where it fastened to the top of the Hydrovac, a booster unit. Witnesses also testified that the brake tube came out of the nut either because the tube broke or was improperly flared.

3

Plaintiff contends that the tube broke because there was a manufacturing defect in the tube, basically a bad flare, when the truck came off the assembly line. Plaintiff also contends that the brake system on the truck, a single system, was defectively designed, and argues that GMC's knowledge of available technology coupled with the foreseeable use of the vehicle should have mandated a dual braking system, which provides extra braking power. Plaintiff maintains the accident would have been less severe or would not have happened had the truck been equipped with a dual system.

GMC agreed that the brake tube was defective, but contended that the tube had been altered after it left the GMC assembly line, so that the defective tube was not GMC's responsibility. GMC also contended that the single system was neither a design defect nor unreasonably dangerous, and that the accident would have occurred even if the truck had been equipped with a dual brake system.

I

Did the trial court properly instruct the jury on strict liability?

A party has a right to jury instructions adaptable to his theory of the case when the theory is supported by credible evidence. Cremer v. Cremer Rodeo Land and Livestock Co. (Mont. 1981), 627 P.2d 1199, 1200, 38 St.Rep. 574, 576. It is reversible error to refuse to instruct on an important part of a party's theory of the case. Northwestern Union Trust Co. v. Worm (Mont. 1983), 663 P.2d 325, 327, 40 St.Rep. 758, 761. When the court undertakes to offer its own instruction on the issues raised, its statements must be complete. Tacke v. Vermeer Mfg. Co. (Mont. 1986), 713 P.2d 527, 534, 43 St.Rep. 123, 131.

4

With regard to the GMC chassis-cab, plaintiff presented credible evidence to support his theories of defect in manufacture and defect in design. Plaintiff contends that the jury instructions taken as a whole failed to instruct the jury on design defect. The pertinent jury instructions are as follows:

INSTRUCTION NO. 10

I will now define the doctrine of strict liability to you. Keep in mind that this is only a general definition, and must be considered along with the specific instructions on the same topic which follow. The general principle of strict liability as it applies in the State of Montana is:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:

> > (a) the seller is engaged in the business of selling such a product, and

> > (b) it is expected and does reach the user or consumer without substantial change in the condition in which it is sold.

> (2) The rule stated in Subsection (1) applies although

> > (a) the seller has exercised all possible care in the preparation and sale of his product, and

> > (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

INSTRUCTION NO. 11

The plaintiff must establish three essential elements in order to recover under his theory of strict liability. They are as follows:

> First, that the defendant General Motors Corporation manufactured and sold a product which at the time General Motors sold it was

5

in a defective condition unreasonably dangerous to the consumer or user;

Second, that the product was expected to and did reach the ultimate consumer without substantial change in the condition it was in at the time it was sold; and

Third, that the defective condition in the product proximately caused injury to the plaintiff.

Jury instruction #10 is the same as § 402A Restatement (Second) of Torts (1965). Plaintiff did not make an objection at the time the instruction was offered. Plaintiff objected to jury instruction #11 "on the grounds that the second standard improperly states Montana law regarding tracing requirement back to the manufacturer."

Both instructions expressly require that the plaintiff establish the chassis-cab reached the consumer without substantial change from the time of sale. With regard to plaintiff's design defect theory, the instruction required him to prove that the brake system had not been altered after leaving the factory. While the instructions are adequate for a manufacturing defect theory, they misstate design defect law. The plaintiff is not required to prove that there has been no change in condition after sale of a product. So far as plaintiff's design defect issue is concerned, the instruction should have focused on whether GMC improperly designed the product which it placed in the stream of commerce.

The same issue of whether a product must reach the consumer without substantial change in condition was discussed in Kuiper v. Goodyear Tire & Rubber Co. (Mont. 1983), 673 P.2d 1208, 40 St.Rep. 1861. In Kuiper, with regard to design defect cases, this Court adopted the trial court's holding that plaintiff prove the product was placed in the stream of commerce by defendant, and not that the product

6

reached the consumer in substantially the same condition in which it left the manufacturer:

> The correct law governing plaintiff's proof in a design case is found in Brown, 176 Mont. at 105, 106, 576 P.2d at 716, we stated:
>
>> "[1] In order to establish a prima facie case in strict liability based upon the above definition, a plaintiff must prove the following elements:
>>
>> (1) The product was in a defective condition 'unreasonably' dangerous to the user or consumer;
>>
>> (2) The defect caused the accident and the injuries complained of; and
>>
>> (3) The defect is traceable to the defendant."
>
> . . .
>
>> "There is no requirement that a design remain in substantially the same condition since obviously the design of the product does not change from the date of its original manufacture, absent some modification in design which was not an issue in this case.
>>
>> This issue was considered at length during the instruction conference between the court of counsel and it is the court's concerted opinion that in a [product liability] design case, the changes in the product through wear, tear, or even abuse do not affect the question of whether the original design was defective and unreasonably dangerous. Design is judged not by the condition of the product, but the state of scientific and technical knowledge available to the designer at the time the product was placed on the market."

Kuiper, 673 P.2d at 1221.

We hold that the District Court committed reversible error in giving jury instructions #10 and #11 because they do not contain the law applicable to plaintiff's design defect theory.

We will now discuss strict liability under a manufacturing defect theory. Under a manufacturing defect theory, the essential question is whether the product was flawed or

7

defective because it was not constructed correctly by the manufacturer:

> [M]anufacturing defects, by definition, are "imperfections that inevitably occur in a typically small percentage of products of a given design as a result of the fallibility of the manufacturing process. A [defectively manufactured] product does not conform in some significant aspect to the intended design, nor does it conform to the great majority of products manufactured in accordance with that design." (Henderson, Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication, 73 Col.L.Rev. 1531, 1543). Stated differently, a defectively manufactured product is flawed because it is misconstructed without regard to whether the intended design of the manufacturer was safe or not. Such defects result from some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction.

Caprara v. Chrysler Corp. (N.Y. 1981), 436 N.Y.S.2d 251, 258.

Restatement (Second) of Torts, § 402A (1965) has been adopted by this Court as the applicable law with regard to strict liability under a manufacturing defect theory. The Restatement view is contained in Instruction #10, previously quoted in this opinion. In the context of strict liability under a manufacturing defect theory, we conclude that Instructions #10 and #11, as given by the District Court, are adequate. On retrial if the plaintiff presents a manufacturing defect theory, Instructions #10 and #11 must be limited so that they apply only to the manufacturing defect aspect of the case.

We now discuss strict liability under a design defect theory. The focus is not whether the product was made according to specifications, but whether the specifications of the manufacturer were in some way defective. We adopt the following statement from Caprara, 436 N.Y.S.2d at 258-59:

> In contrast, a design defect is one which "presents an unreasonable risk of harm, notwithstanding that

8

it was meticulously made according to [the] detailed plans and specifications" of the manufacturer (Robinson v. Reed-Prentice Div. of Package Mach. Co., 49 N.Y.2d 471, 479, 426 N.Y.S.2d 717, 403 N.Y.2d 440 supra.) Thus, unlike manufacturing defects, design defects involve products which are made in precise conformity with the manufacturer's design but nevertheless result in injury to the user because the design itself was improper.

We have attempted to review the design defect cases of other states as well as law review articles and other discussions of design defect theory. At the present time there are significant contradictions between the approaches of various states, with no single theory being widely adopted. We conclude that it would not be helpful to compare and contrast these theories at length, but instead refer the reader to various works.[1]

We do not attempt to set forth an analysis which addresses all facets of strict liability under a design defect

---

[1]  Lee v. Butcher Boy (Cal.Ct.App. 1985), 215 Cal.Rptr. 195; Ford Motor Co. v. Pool (Tex.Civ.App. 1985), 688 S.W.2d 879; Dart v. Wiebe Mfg., Inc. (Ariz. 1985), 709 P.2d 876; Prentis v. Yale Mfg. Co. (Mich. 1984), 365 N.W.2d 176; O'Brien v. Muskin Corp. (N.J. 1983), 463 A.2d 298; Nerud v. Haybuster Mfg., Inc. (Neb. 1983), 340 N.W.2d 369; Lester v. Magic Chef, Inc. (Kan. 1982), 641 P.2d 353; Caprara v. Chrysler Corp. (N.Y. 1981), 436 N.Y.S.2d 251; Boatland of Houston, Inc. v. Bailey (Tex. 1980), 609 S.W.2d 743; W. Prosser & W. Keeton, THE LAW OF TORTS, § 99 (5th ed. 1984); W. Kimble & R. Lesher, Products Liability, §§ 131-38 (1979); Birnbaum & Wrubel, "State of the Art" and Strict Products Liability, 21 Tort & Insurance L. J. 30 (1985); Note, The Design Defect Test in Washington: The Requisite Balance, 8 U. Puget Sound L. Rev. 679 (1985); Note, Practicable Alternatives and Design Defects: A Plaintiff's Burden?-- Nerud v. Haybuster Mfg., Inc., 18 Creighton L. Rev. 477 (1985); Note, Strict Products Liability And The Risk Utility Test For Design Defect: An Economic Analysis, 84 Colum L. Rev. 2045 (1984); Twerski, From Risk-Utility to Consumer Expectations: Enhancing the Role of Judicial Screening in Product Liability Litigation, 11 Hofstra L. Rev. 861 (1983). See Also the Uniform Product Liability Act (1979) and the proposed interstate commerce "Product Liability Act" (1983), which was never ratified by the U.S. Congress.

theory. We render an opinion only with regard to the following facet of design defect: Was the GMC single brake system defective and unreasonably dangerous in view of the fact that a dual brake system was technologically feasible at the time of manufacture and was offered by GMC for sale? We do not rule upon the fact situation where a claim of design defect is made and where no alternative design is technologically feasible. See O'Brien v. Muskin Corp. (N.J. 1983), 463 A.2d 298.

While many courts have attempted to define design defect by the terminology of unreasonably dangerous design or defective design, we do not find these tests to be helpful and choose not to adopt them. However, we do find that §104B of the Uniform Product Liability Act (1979) contains an excellent analysis of the factors which may be significant in an alternative design product liability case. [2]

We concur with the Uniform Act that a balancing of various factors is required on the part of a jury. A jury should be instructed to weigh various factors according to

---

[2]    104(B) <u>The Product Was Defective in Design.</u>

The harm was caused because the product was defective in design. In determining whether the product was defective, the trier of fact shall consider whether an alternative design should have been utilized, in light of:

(1) The likelihood at the time of manufacture that the product would cause the harm suffered by the claimant;

(2) The seriousness of that harm;

(3) The technological feasibility of manufacturing a product designed so as to have prevented claimant's harm;

(4) The relative costs of producing, distributing, and selling such an alternative design; and

(5) The new or additional harms that may result from such an alternative design.

the facts of each case and their own judgment. We conclude that the following elements should be considered for instructional purposes in an alternative design products liability case, recognizing that not all factors may be appropriate in every case, and also recognizing that additional factors should be considered where appropriate:

(1) A manufacturer who sells a product in a defective condition unreasonably dangerous because of a design defect is subject to liability for harm thereby caused to the ultimate user.

(2) A product may be in a defective condition unreasonably dangerous if the manufacturer should have used an alternative design.

(3) In determining whether an alternative design should have been used, the jury should balance so many of the following factors as it finds to be pertinent at the time of manufacture:

(a) The reasonable probability that the product as originally designed would cause serious harm to the claimant.

(b) Consideration of the reasonable probability of harm from the use of the original product as compared to the reasonable probability of harm from the use of the product with the alternative design.

(c) The technological feasibility of an alternative design that would have prevented claimant's harm.

(d) The relative costs both to the manufacturer and the consumer of producing, distributing and selling the original product as compared to the product with the alternative design.

(e) The time reasonably required to implement the alternative design.

We emphasize that it would be appropriate for the District Court to supplement the foregoing factors based upon the proof submitted in the course of trial. We reemphasize that the foregoing factors should be applied where a manufactured product is claimed to be unreasonably dangerous because a safer alternative design was available to the manufacturer.

11

We do not rule upon other facets of this complex area of the law.

## II

Is Rule 407, M.R.Evid., applicable to products liability under a strict liability theory, thus making evidence of subsequent design changes not admissible?

According to Rule 407, M.R.Evid., subsequent remedial changes cannot be admitted into evidence to prove negligence or culpable conduct:

> Rule 407. Subsequent remedial measures.
>
> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

The District Court concluded that Rule 407, M.R.Evid., was applicable to strict liability actions and that evidence of subsequent design modification could only be introduced for "other purposes."

Plaintiff maintains that Rule 407 is inapplicable in the context of strict liability, because neither negligence nor culpable conduct is at issue. Plaintiff argues that he should be allowed to prove that GMC has dropped the single brake system, and installs only the dual brake system on its trucks. GMC contends the fact that it no longer offers single brake systems is irrelevant and inadmissible under Rule 407, M.R.Evid.

In a strict liability action under a manufacturing defect theory, the issue is whether the manufactured product left the factory in a flawed condition because it did not

conform to original design specifications. See <u>Caprara</u>, 436 N.Y.S.2d 251, 258. Under a manufacturing defect theory one assumes that the design is safe and had the product been manufactured in accordance with the design, it would have been safe for consumer use. Here, plaintiff sought to prove a manufacturing defect by showing that the brake line was not manufactured according to specifications because it contained a bad flare, which allowed the brake line to come out of the nut where it was fastened to the top of the Hydrovac. Consequently, under a manufacturing defect theory, evidence of design modification is without probative value and irrelevant because the safeness of the original design is not an issue. In the context of strict liability under a manufacturing defect theory, we conclude that evidence of subsequent design change is not admissible unless it is to be admitted for some other purpose.

In a strict liability action under a design defect theory, the question is whether the design specifications were partly or totally defective. As stated previously, a design is defective if at the time of manufacture an alternative designed product would have been safer than the original designed product and was both technologically feasible and a marketable reality. Again the time frame under scrutiny is the time of manufacture and not any other time. We conclude that evidence of subsequent design modification is not probative of whether a product was defectively designed at the time of manufacture. We do recognize that evidence of design change may be probative for other purposes such as technological feasibility and impeachment. As an example, evidence of subsequent design change may be admitted to show technological feasibility where the manufacturer has controverted

technological feasibility of an alternative design. See Cohen v. General Motors Corporation (N.Y. 1984), 473 N.Y.2d 378, 382. None of these exceptions were present here.

We hold that Rule 407, M.R.Evid., is applicable to strict liability actions under both manufacturing and design defect theories, making evidence of subsequent design changes generally not admissible.

### III

Did the District Court abuse its discretion by excluding disputed conversations between two insurance adjusters?

After the accident, John Fisher, driver of the GMC truck, filed a claim for damages with Farmers Insurance Group [Farmers]. It was estimated that the GMC chassis-cab sustained $2,300 worth of damages. On August 15, eleven days after the accident, Royal Globe Insurance Company of America, which insures GMC, hired General Adjustment Bureau (GAB) in Billings to investigate the accident. Tom Ramboldt investigated and adjusted the accident for GAB.

Ray Olson investigated the accident for Farmers. On September 22, 1978, approximately 48 days after the accident, Farmers paid Mr. Fisher for property damages to the 1978 GMC two ton chassis-cab.

Whether Mr. Olson [Farmers] talked to Mr. Ramboldt [GAB] prior to settlement with Mr. Fisher [driver of truck] cannot be gleaned from the record. However, after settlement with Mr. Fisher, Farmers subrogated its claim against GMC, and Mr. Olson talked with Mr. Ramboldt on a number of occasions. Mr. Olson was prepared to testify that on at least two occasions Mr. Ramboldt advised him that GMC would accept liability. On both occasions that the alleged admissions were made, Mr. Olson recorded his reflections on a speed memo.

14

Mr. Rix contends that Mr. Ramboldt's statements are admissible pursuant to Rule 801 (d)(2)(D), M.R.Evid., which states:

> (d) Statements which are not hearsay. A statement is not hearsay if:
> (2) Admission by party-opponent. The statement is offered against a party and is . . . (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of that relationship . . .

Mr. Rix maintains Mr. Ramboldt's statements, as an agent of GMC, are admissions by a party-opponent and properly admissible. GMC denies that Mr. Ramboldt ever accepted liability. GMC also maintains that even if the statements were admissions by a party opponent, they are inadmissible under Rule 408, M.R.Evid., which protects statements made in the course of compromise negotiations:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. . .

A real problem exists because the facts are not shown in a complete manner in the record. We conclude that the incomplete record eliminates our ability to determine this issue. Should the question be raised at retrial, the District Court should consider all of the facts before ruling on admissibility, including whether Mr. Ramboldt was an agent of GMC and whether he was acting in the course and scope of that agency, and whether compromise negotiations had taken place between Mr. Olson and Mr. Ramboldt.

15

IV

Is _res ipsa loquitur_ applicable to products liability under a strict liability theory?

Mr. Rix contends that his case was prejudiced when his jury instructions on _res ipsa loquitur_ were refused and the District Court failed to substitute other _res ipsa loquitur_ jury instructions. This Court has stated previously that, as a general rule, _res ipsa loquitur_ is applicable to products liability under a negligence theory, but is not applicable to products liability under a strict liability theory. Brothers v. General Motors Corp. (Mont. 1983), 658 P.2d. 1108, 1110, 40 St.Rep. 226, 229.

In _Brothers_, while we ruled against _res ipsa loquitur_ under a strict liability theory, we reaffirmed our committment to a flexible standard of circumstantial evidence, as follows:

> Circumstantial evidence, as well as direct evidence, may be used to show a defect. A plaintiff does not meet his burden of proof, however, by merely establishing an accident occurred. . . .
>
> [c]ircumstantial evidence can be met by proof of the circumstances of the accident, similar occurrences under similar circumstances, and elimination of alternative causes. . .

_Brothers_, 658 P.2d at 1109-10 (citations omitted). We conclude this case presents no unique circumstances that would warrant deviation from the general rule. We affirm the District Court's exclusion of _res ipsa loquitur_ jury instructions.

V

Did the District Court abuse its discretion by admitting GMC's cross-examination of Dan Williams?

16

Dan Williams was the owner of Berkley Machine & Equipment, which shortened the frame of the 1978 GMC two ton chassis-cab so that the truck could be equipped with a water tank. The employee who did the actual shortening of the frame did not testify because he could not be located. On cross-examination, Dan Williams was asked if in the past he had "actually drilled through frames and drilled into a brake line." He answered, "Yes. I think anybody that has done this work very long has done it one time or another." The next question, which logically followed, was objected to on the grounds it called for speculation. The question was "could that have happened when you were working on Mr. Fisher's [1978 GMC]." With continuing objections to this whole line of questions, Mr. Williams essentially answered that it was possible but not probable.

Mr. Rix contends that the opinion advanced by Williams was not rationally based or helpful to the determination of the facts in issue. According to Rule 701 M.R.Evid., a lay witness may give an opinion when two criteria are established: the opinion is "rationally based on the perception of the witness and helpful to . . . the determination of a fact in issue."

Both parties agreed that the brake line was defective, but disagreed as to whether it left the factory in a defective condition or was later altered. GMC maintained the brakeline could have been altered at Berkley Machine and Equipment when the truck frame was shortened.

Undoubtedly, the question of whether Dan William's shop could have altered the line was helpful to determining a major fact issue. Also, because the employee who did the actual shortening of the frame was not available as a

17

witness, the owner of the shop was an appropriate witness to respond to questioning with regard to shortening truck frames and altering brake lines. We conclude the District Court did not abuse its discretion in admitting the cross-examination of Dan Williams.

VI

Did the District Court abuse its discretion by refusing to compel GMC to further supplement its discovery responses?

The standard of review is as follows:

> The District Court has the inherent discretionary power to control discovery. That power is based on the District Court's authority to control trial administration. In controlling discovery the District Court must regulate traffic to insure a fair trial to all concerned, neither according one party an unfair advantage nor placing the other party at a disadvantage . . .
>
> We will reverse the District Court only when its judgment may materially affect the substantial rights of the appellant and allow the possibility of a miscarriage of justice.

Massaro v. Dunham (1979), 184 Mont. 400, 404-05, 603 P.2d 249, 251-52 (citations omitted).

Rix contends that GMC's failure to answer certain interrogatories denied him the opportunity to utilize significant information. GMC contends it adequately and fully answered the interrogatories.

The issue was discussed and ruled upon by the District Court. The District Court denied the motion on the basis that the requested interrogatories had been previously answered.

We have reviewed the interrogatories, depositions and supplemental memoranda. We conclude that the information sought by the plaintiff was made available with the exception

18

of the request for the names of particular persons involved in testing and inspecting during manufacturing in 1978. GMC indicated there were thousands of inspections and tests performed by a great number of people. The interrogatories were overly broad and burdensome under the facts of the case. We conclude that the District Court did not abuse its discretion.

We reverse and remand for a new trial in conformity with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Honorable Frank I. Haswell, retired Chief Justice sitting for Mr. Justice John C. Sheehy.

_____

_____

_____
Justices

19