No. 99-580

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 133

PARNACITA SAMSON, for herself and as
Personal Representative of the Estate of
MATTHEW "MARK" SAMSON, on behalf
of the heirs and successors of decedent,

Plaintiff and Appellant,

v.

THE STATE OF MONTANA,

Defendant and Respondent.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade, Cause No. ADV-97-1380
Honorable Kenneth R. Neill, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Joseph C. Engel III, Attorney at Law, Great Falls, Montana

Dane J. Durham, Attorney at Law, Missoula, Montana

For Respondent:

Honorable Mike McGrath, Attorney General; John C. Melcher, Assistant
Attorney General, Helena, Montana

Maxon R. Davis, Davis, Hatley, Haffeman & Tighe, P.C.,
Great Falls, Montana

Submitted on Briefs:   October 11, 2001

Decided:   April 29, 2003

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Appellant Parnacita Samson (Samson), Personal Representative for the Estate of Michael "Mark" Samson (Mark), appeals the jury verdict entered in the Eighth Judicial District Court, Cascade County, finding the State of Montana (State) was not negligent in the death of Mark.  We affirm.

¶2     The following issues are dispositive:

¶3     1.  Whether the jury's verdict for the State was supported by substantial evidence.

¶4     2.  Whether the District Court erred in admitting evidence that the shooting was an unforeseeable accident.

¶5     3.  Whether the District Court erred in failing to give Plaintiff's instruction on the meaning of negligent homicide.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6     The Cascade County Youth Court committed Bridger Bercier (Bercier) to Pine Hills as a serious juvenile offender in January 1995.  He was fifteen years old at the time.  On February 10, 1996, following Bercier's completion of a successful home visit and continued improved behavior, Pine Hills released Bercier for a trial community placement at Youth Evaluation Program (YEP), a non-secure supervised facility in Great Falls.  YEP is a licensed youth group home used to transition boys from Pine Hills to community placements.  Bercier's stay at the YEP was uneventful.  However, on March 16, 1996, he walked out of the facility.  Bercier's leaving was timely reported to law enforcement.

2

¶7 Bercier remained at large in Great Falls for nine days. During the evening of March 25, 1996, Bercier and two other youths, Dale Brott (Brott) and Tony Samson (Tony), were socializing in the basement of the Samson family home. Bercier had been over at the Samson home earlier in the day helping the Samson family push a car off the street and into the driveway. Brott saw that Bercier had a gun that afternoon, and Bercier had the gun with him at the Samson house that evening. All three boys were drinking beer they had retrieved from Bercier's house. The three boys were joined by Mark, Tony's younger brother.

¶8 Bercier passed Mark the gun without the clip. When Mark returned the gun to Bercier, all four boys were sitting on a couch. Mark sat next to Bercier on the couch. Bercier began pulling the clip in and out of the gun, and cocking and uncocking the gun. Bercier then discharged one round, killing Mark. The next morning Bercier surrendered to the Great Falls police. He pled guilty to negligent homicide and was returned to Pine Hills.

¶9 Samson then brought a negligence action against the State of Montana. After a six-day trial, the jury returned a verdict for the State. Samson appeals from the judgment.

## DISCUSSION

¶10 **Was the jury's verdict in favor of the State supported by substantial evidence?**

¶11 We review a jury's verdict to determine whether there is substantial credible evidence in the record to support it. *Magart v. Schank,* 2000 MT 279, ¶ 4, 302 Mont. 151, ¶ 4, 13 P.3d 390, ¶ 4, citing *Barnes v. United Industry, Inc.* (1996), 275 Mont. 25, 33, 909 P.2d 700, 705. It is not our function to agree or disagree with the jury's verdict and, consequently, if conflicting evidence exists, we do not retry the case because the jury chose to believe one

3

party over the other. *Magart*, ¶ 4, citing *Barnes,* 275 Mont. at 33, 909 P.2d at 705. It is only in rare cases that a jury verdict should be set aside. *Magart*, ¶ 4. Moreover, in reviewing the sufficiency of the evidence to support a jury verdict, we review the evidence in a light most favorable to the prevailing party. *Magart*, ¶ 4; *Morgan v. Great Falls School Dist. No. 1*, 2000 MT 28, ¶ 8, 298 Mont. 194, ¶ 8, 995 P.2d 422, ¶ 8.

¶12    Samson argues that uncontradicted, credible evidence shows that the State was negligent. Samson points out that the record demonstrates Pine Hills transferred Bercier to a non-secure facility without obtaining a complete psychological evaluation during the thirteen months that he was at Pine Hills, a violation of the court order committing Bercier to Pine Hills. Additionally, Pine Hills transferred Bercier to a non-secure group home in Great Falls even though he was ineligible for leave and on disciplinary status. Moreover, the record shows the State failed to contact Bercier's parents during the nine days between his escape from the group home and the shooting.

¶13    The State contends it presented evidence contesting that these failures constituted negligence. Testimony from the State's witnesses explained the lack of a psychological evaluation of Bercier while he was at Pine Hills. Prior to arriving at Pine Hills, Bercier had a chemical dependency evaluation that was used in developing his treatment plan. Also, an intake evaluation of Bercier had been conducted which indicated that he had no serious mental illness that would require a further psychological evaluation. In June 1996, after the shooting, a psychological evaluation of Bercier was conducted. Looking at those results, the

4

social worker at Pine Hills testified that she would not have altered Bercier's treatment plan in 1995 had the results of the psychological evaluation been available to her at that time.

¶14 Witnesses from Pine Hills also explained why Bercier was transferred from Pine Hills to a non-secure home in Great Falls, even though he was not eligible for leave and was on disciplinary status. When the decision to transfer Bercier to YEP was initially made, he was rated at a Level III behavioral level, the highest and most favorable level. However, at the time of transfer, Bercier had been downgraded to a Level I, due to an altercation with another person at Pine Hills. The Pine Hills team working on Bercier's case determined that, despite the drop in his behavioral level, it was in Bercier's best interest to transfer him because at the YEP facility he could receive chemical dependency treatment that could not be obtained at Pine Hills. In regard to Bercier's escape, the State presented evidence that YEP had properly reported his escape to law enforcement and that the staff had no authority or responsibility to track down Bercier. The State acknowledged that staff did not contact Bercier's parents about his escape, but offered that his parents had previously been uncooperative with the State on issues regarding Bercier's actions and whereabouts.

¶15 It is not the duty of this Court to retry the case and evaluate the facts to determine if the State was negligent. Rather, we review a jury's verdict to determine whether there is substantial credible evidence in the record to support it. *Magart*, ¶ 4. Based on a review of the record before us, we conclude there was sufficient evidence presented to support the jury's conclusion that the State was not negligent. Therefore, we will not overturn the jury's verdict.

**¶16 Did the District Court err in admitting evidence that the shooting was an unforeseeable accident?**

¶17 The standard of review for evidentiary rulings is whether the district court abused its discretion. *State v. Riley* (1995), 270 Mont. 436, 440, 893 P.2d 310, 313. The trial court exercises broad discretion in determining relevance of evidence. *State v. Smith*, 1998 MT 257, ¶ 6, 291 Mont. 236, ¶ 6, 967 P.2d 424, ¶ 6.

¶18 Samson argues the District Court erred in allowing the State to present evidence and to argue that the shooting was an "unforeseeable accident." Samson contends the court abused its discretion in denying Samson's Motion to Disallow Testimony of Ken Baker, an expert witness for the State.

¶19 Baker has an extensive background in law enforcement, including service as chief of the behavior sciences unit of the United States Secret Service. His experience and training includes study and work in the assessment and predictability of an individual's potential for violent behavior, particularly toward governmental and corporate officials. Baker assessed, and offered testimony regarding, the predictability of Bercier's violence, which the District Court allowed.

¶20 The State correctly observes that Samson has appeared to abandon her challenge to Baker's qualifications to testify as an expert under Rule 702, M.R.Evid., which was one basis for her argument in the District Court. Instead, Samson focuses on her contention that Baker, though sufficiently qualified in his particular field, did not offer testimony constituting "scientific, technical or other specialized knowledge" that would "assist the trier

6

of fact," as also required by Rule 702. In other words, Samson, describing Baker's testimony as "psycho-babble," argues that the jury was perfectly capable of determining the predictability of Bercier's actions by assessing the evidence, and did not need, nor was assisted by, Baker's expert testimony.

¶21 After testifying regarding his qualifications and his assessment of this matter, Baker opined that the shooting here was accidental and not predictable, focusing on factors such as his analysis of the crime scene, Bercier's post-shooting behavior, and particularly, Bercier's personal history. He testified:

> Baker: . . . I saw nothing in his background that involved weaponry. . . . I didn't see in Bridger Bercier's background crimes of violence against people. I saw lots of crimes against property and thefts and thievery and stealing and such. But I did not see crimes that involved attacking people or especially with weapons or knives or guns or that type of thing.
>
> Def. Cnsl: Is that significant to you?
>
> Baker: Absolutely significant.
>
> Def. Cnsl: Why so?
>
> Baker: Well, because the absence of that deals with predictability . . . . [I]n terms of predictability, it certainly makes a big difference to me after having looked at the record as to whether or not this crime was predictable in [sic] my opinion is that it was not predictable.
>
> Def. Cnsl: Well –
>
> Baker: It was not foreseeable.

¶22 It is necessary, in order to sustain a negligence action, that the plaintiff establish a legal duty on the part of the defendant, a breach of that duty, causation, and damages. *Lopez*

7

*v. Great Falls Pre-Release Services, Inc.*, 1999 MT 199, ¶ 18, 295 Mont. 416, ¶ 18, 986 P.2d

1081, ¶ 18.  Further, in *LaTray v. City of Havre*, 2000 MT 119, 299 Mont. 449, 999 P.2d

1010, we explained that in cases involving a dispute over the intervening criminal act of a

third party, as here, foreseeability must be analyzed twice: first, with regard to the existence

of a legal duty, and second, with regard to proximate causation.  *LaTray*, ¶ 17.  "[A]nalyzing

foreseeability in the duty context, we look to whether or not the injured party was within the

scope of risk created by the alleged negligence of the tortfeasor–that is, was the injured party

a foreseeable plaintiff?"  *Lopez*, ¶ 28.  In analyzing foreseeability in the context of proximate

cause, "we are concerned with whether and to what extent the defendant's conduct

foreseeably and substantially caused" the injury sustained by the plaintiff.  *Lopez*, ¶ 32.

¶23    Further, we have explained that:

> in cases involving intervening superseding acts of a criminal or noncriminal
> nature, "trial courts must continue to carefully review each fact situation . . .
> on a case-by-case basis . . . ."  *Estate of Strever*, 278 Mont. at 179, 924 P.2d
> at 674.  The causal issue of intervening criminal or noncriminal acts "normally
> involves questions of fact which are more properly left to the finder of fact for
> resolution."  *Estate of Strever*, 278 Mont. at 178, 924 P.2d at 674.

*Lopez,* ¶ 34.

¶24    The State contends that it was necessary for its defense to present the testimony of

Baker.  Because the jury was required to determine the foreseeability of the intervening act,

it needed information relating to the foreseeability of Bercier's actions, and thus, the State

argues Baker's testimony was relevant and necessary and aided the jury.

8

¶25 As we held in *Lopez* and *LaTray*, determining causation requires a consideration of the foreseeability of the intervening criminal act. In *LaTray*, where a defendant's liability under similar circumstances was at issue, we stated:

> Here, as in *Lopez*, we are concerned with whether Shawn's assault was a superseding cause of the harm incurred by LaTray which, if not reasonably foreseeable, would break the chain of causation and absolve the City of liability.

*LaTray*, ¶ 28. *See also Lacock v. 4B's Restaurants, Inc.* (1996), 277 Mont. 17, 919 P.2d 373. Thus, it was necessary for the jury to determine whether the chain of causation was broken by the unforeseeability of Bercier's conduct, and, in that regard, Baker's testimony offered an analysis which purported to assess predictability of Bercier's actions. As stated above, the trial court exercises broad discretion in determining the relevancy of evidence. *Smith*, ¶ 6. Given the jury's need to determine the foreseeability of Bercier's actions, we determine that, under the particular challenge made here, the District Court did not abuse its discretion in allowing the testimony of Baker and denying Samson's Motion to Disallow Testimony of Ken Baker.

¶26 An inconsistency has developed in our cases involving, as here, the foreseeability of an intervening cause, and it is appropriate that we resolve that conflict. In *Lacock*, we held that when considering foreseeability as an element of causation:

> [I]t will be necessary for the court to discuss foreseeability in the course of explaining to the jury which intervening causes sever the chain of causation and which do not. In doing so, it will be necessary to instruct the jury consistently with the provisions of § 27-1-317, MCA, that is, *that the specific injury to a plaintiff need not have been foreseen*.

9

*Lacock*, 277 Mont. at 22, 919 P.2d at 375-76 (emphasis added). However, despite this clear holding, language which would require a jury to determine the foreseeability of a plaintiff's "specific injury" has crept back into our opinions. *See Lopez*, ¶ 32, and *LaTray*, ¶ 28. While it was not the Court's intention in either *Lopez* or *LaTray* to revise *Lacock's* holding on this issue, the language used in those cases is clearly contradictory thereto. Therefore, we take this opportunity to resolve this inconsistency by reaffirming our holding in *Lacock*, confirming that in cases alleging an intervening cause, juries must be instructed that the specific injury to the plaintiff need not have been foreseen.

¶27 **Did the District Court err in failing to give Plaintiff's instruction on the meaning of negligent homicide?**

¶28 It is within a district court's discretion to decide how to instruct the jury, taking into account the theories of the contending parties. *Allison v. Town of Clyde Park*, 2000 MT 267, ¶ 11, 302 Mont. 55, ¶ 11, 11 P.3d 544, ¶ 11. This Court will not overturn a district court for instructions given to a jury without an abuse of discretion. *Allison,* ¶ 11. This Court reviews the instructions as a whole and in light of all the instructions and the evidence introduced at trial. *Federated Mut. Ins. Co. v. Anderson*, 1999 MT 288, ¶ 44, 297 Mont. 33, ¶ 44, 991 P.2d 915, ¶ 44. Absent prejudice, the trial court's decision will be affirmed. *Federated Mut.,* ¶ 44. No prejudice can be shown where the jury instructions in their entirety state the applicable law of the case. *Federated Mut.,* ¶ 44.

10

¶29 Samson argues that the District Court abused its discretion in rejecting her proposed jury instruction defining the mental state of negligent homicide. Samson's proposed instruction reads as follows:

> Instruction No. 30: In this case, you, the jury, must accept as conclusively established that Bridger Bercier, in his answering true to the accusation in Youth Court that he committed the crime of negligent homicide, admitted that his conduct toward Michael "Mark" Samson, in causing his death, was a "gross deviation from the standard of care." For purposes of this case and for your deliberations, you are to accept as conclusive that Bridger Bercier's conduct toward Michael "Mark" Samson was "a gross deviation from the standard of care."

¶30 Without this instruction, Samson claims it was impossible for the jury to understand the significance of Bercier's guilty plea to the charge of negligent homicide and, thus, the jury could not place Bercier's guilty plea within the proper context. By denying Samson's instruction, Samson asserts that the jury was left with only Instruction No. 10's definition of negligence, given to judge the State's conduct herein, and was therefore required, even "directed," to conclude therefrom that Bercier had admitted only to the lack of ordinary or reasonable care when he pled guilty to negligent homicide. Samson then posits that, because of this misdirection, the jurors were not instructed in a manner that would allow them to appreciate that the State was making what Samson contends was an "inconsistent" argument–that the State could charge and accept a plea from Bercier for negligent homicide and then also argue in this action that the shooting was an unforeseeable accident. Samson contends that it was a gross injustice for the State to take these inconsistent positions, and

11

error for the District Court to deny her instruction meant to highlight the State's fundamentally unfair posture.

¶31	Samson relies on this Court's holdings in *Rix v. General Motors* (1986), 222 Mont. 318, 723 P.2d 195, and *Chambers v. Pierson* (1994), 266 Mont. 436, 880 P.2d 1350, to claim the District Court committed reversible error. In those cases we stated, "A party has a right to jury instructions adaptable to his theory of the case when the theory is supported by credible evidence. It is reversible error to refuse to instruct on an important part of a party's theory of the case." *Rix*, 222 Mont. at 323, 723 P.2d at 198.

¶32	The State argues that it was not necessary for the District Court to instruct the jury on the mental state of the crime of negligent homicide. According to the State, when taken as a whole, the instructions given by the District Court properly instructed the jury on the State's duty of custody and supervision, set out the elements for recovery based on negligence, defined negligence, and instructed the jury to find the State liable if the State's negligence was a cause of the death of Mark Samson. The State asserts the instructions properly included the key concepts in this wrongful death action. Relying on *Busta v. Columbus Hosp. Corp.* (1996), 276 Mont. 342, 916 P.2d 122, the State contends trial courts should not instruct on related legal concepts which do not control issues before the jury. According to the State, the mental state of Bercier at the time he committed the crime was not a controlling issue in the wrongful death case, and the District Court properly exercised its discretion in denying Samson's proposed Instruction No. 30.

12

¶33 On appeal, Samson has not argued that the State was in any way estopped by the homicide proceeding from defending this action with a foreseeability-related causation defense. In the District Court, Samson argued that the State was judicially estopped from offering its foreseeability theory, and tendered Instruction No. 30 in conjunction with that estoppel defense, which was denied. Here, Samson simply challenges the denial of the instruction itself, without the accompanying estoppel argument.

¶34 Samson also offered Instruction No. 30 to boost her own foreseeability theory, which defined Bercier's conduct as reckless and postulated therefrom that it was foreseeable because of his background. Using this argument, Samson sought to undermine the State's contention that this was an accidental shooting which could not have been foreseen.

¶35 However, the fundamental issue in this wrongful death action concerned the State's negligence, not the mental state of Bercier, and the instructions given by the District Court properly reflected that. When viewed in their entirety, the jury instructions given by the District Court properly stated the applicable law of the case. As such, the instructions given were adaptable to Samson's argument, and it was within the District Court's discretion to deny the proposed instruction.

¶36 Further, the denial of the proposed instruction did not prejudice Samson's case, as Samson was nonetheless able to present her foreseeability theory. Of course, it was not lost on anyone involved in the trial, including the jury, that this tragic incident arose from an utter lack of caution or care. Samson's counsel elicited from the deputy county attorney who prosecuted Bercier that he had determined that Bercier's actions constituted "a gross

deviation from the standard of care," from which Samson's counsel argued in his closing argument that the shooting was much more than an accident. Therefore, while the proposed instruction may have been helpful to Samson's presentation, she was not prevented from asserting her theory on the foreseeability of this tragedy under the instructions which were given, and thus, sustained no prejudice as a result of the District Court's denial.

¶37 Finding no abuse of discretion nor prejudice to the plaintiff herein, the decision of the District Court is affirmed.

/S/ JIM RICE

We concur:

/S/ JAMES C. NELSON
/S/ JIM REGNIER

14

Justice W. William Leaphart dissenting.

¶38 I dissent from the ruling on issue two. Samson has appealed from the District Court's denial of her motion to disallow testimony of Ken Baker. Baker, an FBI profiler, offered expert testimony concluding that it was not foreseeable that Bercier would escape from YEP and would act violently and shoot Mark. In her motion, Samson argued that Baker's "profile" of Bercier was little more than projection of his own issues, needs and morality. She contended that such "opinion" from a non-psychologist "is the epitome of 'junk,'" is not scientific, and does not assist the trier of fact to understand the evidence, as required by Rule 702, M.R.Evid. On appeal she contends that Baker's "profile" testimony did not involve any legitimate area of specialized knowledge and thus does not come within Rule 702. Rule 702, M.R.Evid., provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

¶39 I agree with Samson that "profiling" was not established as a scientific or specialized area of knowledge which would assist the trier of fact in determining the question of whether Bercier's actions were foreseeable. The District Court erred in not granting Samson's motion to disallow the expert "profile" testimony of Ken Baker. I would reverse Samson's conviction and remand for a new trial.

/S/ W. WILLIAM LEAPHART

15

Justice Terry N. Trieweiler concurring and dissenting.

¶40    I concur with the majority's conclusions that there was sufficient evidence to support the jury's verdict and that the District Court did not abuse its discretion by admitting the testimony of Ken Baker.

¶41    However, I dissent from the majority's conclusion that the District Court did not abuse its discretion when it refused to instruct the jury on the mental state required for negligent homicide. While the issue in this action may, as suggested in the majority Opinion, be limited to the State's negligence, the State defended this action by contending that Bercier's conduct was an unforeseeable accident. As the majority notes, foreseeability is necessary to establish duty which is an element of negligence and was presented to the jury by way of the State's claim that there was an independent intervening cause.

¶42    The State concedes on appeal that "the intentional or accidental nature of the intervening act is clearly relevant" to foreseeability and that the purpose for offering Ken Baker's testimony was to establish that Bercier's conduct which caused Mark Samson's death was merely an unforeseeable accident. However, the State's position was inconsistent with its prior position when it prosecuted Bercier. In that case, the State contended and, in fact, accepted Bercier's plea that his conduct exceeded the degree of culpability required for civil negligence. The State incarcerated Bercier because of that conduct.

¶43    When the State prosecuted Bercier and accepted his guilty plea for negligent homicide, it established that he acted with the following degree of culpability:

16

> [A] person acts negligently and with respect to a result or to a circumstance described by a statute defining an offense when the person *consciously disregards a risk* that the result will occur or that the circumstance exists or when the person disregards a risk of which the person should be aware that the result will occur or that the circumstance exists. The risk must be of a nature and degree that to disregard it involves *a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. "Gross deviation" means a deviation that is considerably greater than lack of ordinary care.* Relevant terms, such as "negligent" and "with negligence", have the same meaning.

Section 45-2-101(42), MCA (emphasis added).

¶44    In other words, while the State contended in this case that the occurrence in question was "accidental," offered testimony from Bercier and Ken Baker to establish that fact, and contended that, therefore, it could not have been foreseen, its position previously had been significantly different. In order to convict Bercier and imprison him, it alleged that his conduct was "considerably greater than lack of ordinary care."

¶45    The misimpression given to the jury was compounded by the fact that the only definition of negligence the jury received was Instruction Number 10 which defined the standard of care in a civil proceeding. There, the jury was led to believe that negligence was simply a "lack of ordinary care." It is no consolation to the plaintiff that the jury was told that Bercier pled guilty to negligent homicide if the only definition of "negligence" that it was given was specifically excluded from the statutory definition of negligent homicide.

¶46    The State concedes that the degree of Bercier's culpability was relevant to the issue of foreseeability. The issue of foreseeability was relevant to the State's negligence and the issue of causation. Therefore, the jury was entitled to know what the State's position was regarding Bercier's degree of culpability on a previous occasion under circumstances where

17

it was not in the State's interest to minimize his conduct. The State should not have been allowed to make up the facts as it went along based on its own interests. I conclude that because the jury was denied that information, the plaintiff was denied a fair trial. For these reasons, I dissent from the majority Opinion. I would reverse the judgment of the District Court and remand for a new trial with proper instructions to the jury.

/S/ TERRY N. TRIEWEILER