No. 93-034

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

HELEN KIRWIN EISENMENGER, an incapacitated
person, by Veronica Eisenmenger, her
Guardian and Conservator,

Plaintiff, Respondent and Cross-Appellant,

v.

ETHICON, INC., a New Jersey corporation,

Defendant and Appellant,

and

JAMES E. **MUNGAS** and MONTANA DEACONESS MEDICAL CENTER,

Defendants and Cross-Respondents.

FILED

MAR 24 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Eighth Judicial District,
               In and for the County of Cascade,
               The Honorable R. D. **McPhillips,** Judge presiding.

COUNSEL OF RECORD:

For Appellant:

**Maxon** Davis, Cure, Borer & Davis, P.C., Great
Falls, Montana; Charles F. Preuss, Preuss, Walker
& Shanagher, San Francisco, California

For Respondents:

Norman L. **Newhall,** Alexander, **Baucus** & Linnell,
P.C., Great Falls, Montana: Susan J. Rebeck, Susan
J. Rebeck, **P.C.,** Great Falls, Montana (Eisenmenger)

James E. Aiken and Tracy Axelberg, **Jardine,**
Stephenson, Blewett & Weaver, P.C., Great Falls,
Montana **(Mungas)**

Neil E. Ugrin, Ugrin, Alexander, Zadick & Slovak,
Great Falls, Montana (Montana Deaconess Medical)

Submitted: February 1, 1994
Decided:  March 24, 1994

Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Helen Eisenmenger suffered serious injury after undergoing surgery in which suture material manufactured by defendant Ethicon, Inc., was used. She filed this product liability claim against Ethicon in the District Court for the Eighth Judicial District, Cascade County. Ethicon appeals a $2.3 million judgment entered against it. We affirm.

We restate the dispositive issues as:

1. Whether the District Court erred in holding that the statute of limitations for Eisenmenger's product liability claim against Ethicon was tolled by § 27-6-702, MCA.

2. Whether the court erred in denying Ethicon's motion for summary judgment.

3. Whether the court erred in imposing a default sanction against Ethicon on the issue of liability.

On October 30, 1985, Helen Eisenmenger underwent a left carotid endarterectomy at the Montana Deaconess Medical Center (the hospital) in Great Falls, Montana. James E. Mungas, M.D., performed the surgery. The incision in Eisenmenger's left carotid artery was closed using 6-O Prolene suture material manufactured and sold by Ethicon.

Two days later, while she was resting in her hospital room, Eisenmenger suddenly experienced bleeding in and from the surgical site. She was returned to the operating room, where Dr. Mungas performed a second, emergency surgery to repair a broken suture in

the carotid artery incision. After the second operation, Eisenmenger suffered a stroke and resulting serious complications. There was little doubt that the broken suture caused Eisenmenger's stroke and subsequent complications: the question was what caused the suture to break.

In January 1988, Eisenmenger, through her guardian and conservator, filed a product liability suit against Ethicon in the District Court for Montana's Eighth Judicial District. Ethicon removed the case to federal court based on diversity jurisdiction. That case was eventually voluntarily dismissed, after this action was filed.

On October 27, 1988, again through her guardian and conservator, Eisenmenger filed a malpractice claim with the Montana Medical Legal Panel against Dr. Mungas and the hospital. She named Ethicon as an "other necessary and proper part[y]" to that claim. After the panel rendered its decision, Eisenmenger filed this action on March 30, 1989.

Ethicon promptly moved for summary judgment, arguing that the general three-year tort statute of limitations on the claim against it had run. The court denied Ethicon's motion, holding that § 27-6-702, MCA, tolled the statute of limitations during the Medical Legal Panel's decision-making process and for thirty days thereafter.

Almost three years later, in February 1992, the court entered summary judgment in favor of Dr. Mungas and the hospital, holding

3

that the theory of res ipsa loquitur was not applicable to the claims against those defendants and that Eisenmenger had produced no evidence of negligence by those defendants. At the same time, the court denied Ethicon's motion for summary judgment on grounds that it would be premature to rule out the admissibility of circumstantial evidence offered by Eisenmenger to show that there had been a manufacturing defect in the suture.

At the end of March 1992, Eisenmenger deposed Ethicon's witness Dr. Olcott, a professor of surgery at Stanford University. Dr. Olcott's opinions, as stated in his deposition, clearly supported a theory that conduct of Dr. Mungas or the hospital could have been the cause of the suture breakage leading to Eisenmenger's injuries. Ten days later, Eisenmenger filed a motion asking the court to assess sanctions against Ethicon for failure to disclose Dr. Olcott's opinions in response to discovery requests dating back to 1988.

In its order granting Eisenmenger's motion, the court stated that Ethicon had made a "knowing concealment" of Dr. Olcott's testimony, and that, had the court known of Dr. Olcott's testimony it was "very doubtful" that Dr. Mungas's motion for summary judgment would have been granted. The court concluded Eisenmenger had suffered extreme prejudice due to Ethicon's discovery abuses and that she was entitled to sanctions. It entered a default judgment against Ethicon on the issue of liability.

4

The case was tried to a jury for purposes of determining the amount of damages. Following the jury's verdict that Eisenmenger's damages totaled $2,308,155, Ethicon appeals. Eisenmenger and Dr. Mungas have each raised issues on cross-appeal but, as a result of our resolution of the issues raised by Ethicon, we do not reach those issues.

ISSUE 1

Whether the District Court erred in holding that the statute of limitations for Eisenmenger's product liability claim against Ethicon was tolled by § 27-6-702, MCA.

Section 27-6-702, MCA, which is part of the Montana Medical Legal Panel Act (Act), provides:

> The running of the applicable limitation period in a malpractice claim is tolled upon receipt by the director of the application for review as to all health care providers named in the application as parties to the panel proceeding and as to all other persons or entities named in the application as necessary or proper parties for any court action which might subsequently arise out of the same factual circumstances set forth in the application.

Ethicon contends § 27-6-702, MCA, tolls the statute of limitations in malpractice claims only, and not in product liability claims such as this one.

Ethicon's position reflects the reference, at the beginning of the statute, to "a malpractice claim." "Malpractice claim" is defined at § 27-6-103(5), MCA, as a claim or potential claim "against a health care provider." "Health care provider" is

5

defined under § 27-6-103(3), MCA, to mean a physician, a dentist, or a health care facility.

Because "malpractice claim" is defined as a claim against a "health care provider," the statement in § 27-6-702, MCA, that the statute of limitations is tolled as to "all health care providers named in the application" addresses most "malpractice claims" as defined in the Act. The only exception initially appears to be malpractice claims against health care providers not named in the application. However, § 27-6-702, MCA, further provides that the tolling applies also "as to all other persons or entities named . . . as necessary or proper parties for any court action . . . out of the same factual circumstances." We conclude that § 27-6-702, MCA, is ambiguous about the types of claims for which it tolls the statute of limitations.

If the plain words of a statute are ambiguous, the next step in judicial interpretation of the statute is to determine the intent of the legislature. Montana Contractors' Ass'n. v. Dept. of Hwys. (1986), 220 Mont. 392, 394, 715 P.2d 1056, 1058. This is accomplished by examining the legislative history of the statute, including the title of the original bill. Montana Contractors' Ass'n., 715 P.2d at 1058; Gaub v. Milbank Ins. Co. (1986), 220 Mont. 424, 428, 715 P.2d 443, 445.

Section 27-6-702, MCA (1983), read:

> The running of the applicable limitation period in a malpractice claim is tolled upon receipt by the director of the application for review and does not begin again

until 30 days after the panel's final decision is entered in the permanent files of the panel and a copy is served upon the complainant and his attorney by certified mail.

(Enacted 17-1314 by Sec. 14, Ch. 449, L. 1977.) The 1985 amendment to § 27-6-702, MCA, added the following language to the first sentence of the statute:

as to all health care providers named in the application as parties to the panel proceeding and as to all other persons or entities named in the application as necessary or proper parties for any court action which might subsequently arise out of the same factual circumstances set forth in the application. [Emphasis added.]

The 1985 amendment to § 27-6-702, MCA, unquestionably created the ambiguity with which we are faced.

The title to the 1985 amending act and the explanation offered with the proposed amendment to § 27-6-702, MCA, are instructive. The title to the amending act stated:

AN ACT REVISING THE MONTANA MEDICAL LEGAL PANEL ACT BY CLARIFYING THE DEFINITIONS OF "HEALTH CARE FACILITY," "MALPRACTICE CLAIM," AND "PHYSICIAN;" CLARIFYING THE ALLOCATION OF ASSESSMENTS AND DETERMINATION OF ASSESS-MENTS: PROVIDING FOR A LATE FEE FOR DELINQUENT ASSESS-MENTS: CLARIFYING THE COMPOSITION OF THE PANEL: CLARIFY-ING THE TOLLING OF THE STATUTE OF LIMITATIONS AGAINST PARTIES NOT PARTIES TO THE CLAIM AND PROVIDING FOR DISMISSAL OF CLAIMS AND THE RUNNING OF THE STATUTE OF LIMITATIONS: AMENDING SECTIONS 27-6-103, 27-6-206, 27-6-301, 27-6-303, 27-6-401, AND 27-6-702, MCA; AND PROVIDING AN IMMEDIATE EFFECTIVE DATE. [Emphasis supplied.]

Ch. 332, L. 1985. The explanation offered by the Montana Medical Legal Panel for the proposed amendment was:

The current statute is unclear as to whether the statute does or does not toll as to those not parties to the panel, such as nurses, under circumstances where physi-cians in the same matter are brought before the panel. The proposed legislation clarifies this, providing for

7

> the tolling of the statute as to all those parties named in the application, whether proper health care providers before the panel or not.

Exhibit D to minutes of House Judiciary Committee, February 19, 1985.

The legislative history of § 27-6-702, MCA, supports the conclusion that the tolling provision applies not only to malpractice claims, as argued by Ethicon, but also to actions against all other persons or entities named in the application as necessary or proper parties for any court action arising out of the same facts. This conclusion is further supported by the rule that an ambiguous statute of limitations should be interpreted, in the interest of justice, to allow the longer period in which to prosecute the action. See James v. Buck (Idaho 1986), 727 P.2d 1136, 1138 (citing cases from Alaska, Hawaii, Arizona, and Utah). We note that Ethicon has long had notice of its alleged liability in this action, minimizing any surprise or prejudice to it from the interpretation we now give to § 27-6-702, MCA.

In this case, the application for review of claim which Eisenmenger filed with the Montana Medical Legal Panel listed Ethicon as an "other necessary and proper part[y]." We hold that the District Court did not err in ruling that the statute of limitations was tolled as against Ethicon.

### ISSUE 2

Whether the court erred in denying Ethicon's motion for summary judgment.

8

This Court's standard of review of a ruling on a motion for summary judgment is the same as a district court's standard in ruling on such a motion: whether the record discloses genuine issues of material fact, and, if not, whether the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P.; Knight v. City of Missoula (1992), 252 Mont. 232, 243, 827 P.2d 1270, 1276.

Ethicon contends that Eisenmenger and the District Court improperly relied on the doctrine of res ipsa loguitur in opposing and denying its motion for summary judgment. Ethicon correctly states that the theory of res ipsa loguitur is not applicable in products liability cases under a strict liability theory. Rix v. General Motors Corp. (1986), 222 Mont. 318, 332, 723 P.2d 195, 204. But neither the District Court nor Eisenmenger relied solely on that theory. They also relied upon a theory of strict liability.

Eisenmenger admits that, at the time Ethicon moved for summary judgment, she had no direct evidence that the suture which broke was defective. However, she maintains she had sufficient circumstantial evidence that the suture was defective to preclude summary judgment. A claim of product defect may be proven by circumstantial evidence. Brandenburger v. Toyota Motor Sales, U.S.A., Inc. (1973), 162 Mont. 506, 517, 513 P.2d 268, 274.

The broken suture was thrown away during Eisenmenger's second surgery. As pointed out in Eisenmenger's brief opposing Ethicon's motion for summary judgment, the only direct evidence concerning

9

the break in this suture was Dr. Mungas's deposition testimony that the suture broke at its midpoint, or between the knots. Eisenmenger cites evidence it produced that, if stress is applied to a nondefective suture, the suture will break at the knot, rather than between the knots. Thus, Eisenmenger argues, the testimony of Dr. Mungas was evidence that the suture was either defective or mishandled. All of the persons assisting with the surgery denied having observed or done anything that damaged or otherwise compromised the suture. No direct evidence was produced to contradict their testimony, and their credibility on this issue is a question of fact.

Eisenmenger also points to circumstantial evidence she marshalled concerning other incidents of failure of Ethicon's Prolene 6-O suture material. Ethicon argues that this evidence is inadmissible. However, in denying Ethicon's motion for summary judgment, the District Court stated that it had not yet determined whether all of the evidence of other incidents of suture failure would be admissible. All reasonable inferences from the offered proof are to be drawn in favor of the party opposing summary judgment. Reaves v. Reinbold (1980), 189 Mont. 284, 287, 615 P.2d 896, 898.

We hold that the court did not err in ruling that Eisenmenger demonstrated issues of material fact precluding the entry of summary judgment in favor of Ethicon.

10

ISSUE 3

Whether the court erred in imposing a default sanction against Ethicon on the issue of liability.

Eisenmenger's motion for sanctions was made under Rule 37(d), M.R.Civ.P., which authorizes a district court to award sanctions:

> if a party . . . fails (1) to appear before the officer who is to take the deposition, after being served with a proper notice, or (2) to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, or (3) to serve a written response to a request for inspection submitted under Rule 34, after proper service of the request[.]

Ethicon urges that subsection (d) would apply only if it had failed completely to answer interrogatories. In support of its position, it cites several cases decided under Rule 37(b), Fed.R.Civ.P. The value of those cases as precedent is distinctly limited because they were decided under a different subsection of the federal, not the state, rule.

In Vehrs v. Piquette (1984), 210 Mont. 386, 684 P.2d 476, this Court affirmed Rule 37(d) sanctions for unsigned, late, not-fully-responsive answers to interrogatories. Therefore, a complete failure to answer interrogatories or otherwise respond to discovery requests is not required before sanctions are allowed under Rule 37(d), M.R.Civ.P. We conclude the District Court had the power to award sanctions in this case. We next examine whether the sanction of default judgment was justified.

In Audit Services v. Kraus Construction, Inc. (1980), 189 Mont. 94, 615 P.2d 183, this Court quoted with approval and applied

11

the following standard for entering a default judgment as a sanction under Rule 37, M.R.Civ.P.:

> [T]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party. In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights. The default judgment remedy serves as such a protection. Furthermore, the possibility of a default is a deterrent to those parties who choose delay as part of their litigative strategy[.][Citation omitted.]

Audit Services, 615 P.2d at 187-88. Ethicon cites Audit Services as authority that default judgment is proper only when there has been a complete failure to respond to discovery requests. But the last sentence quoted above supports a broader interpretation allowing default judgment as a sanction for other severe and deliberate discovery abuse.

Our standard of review of sanctions imposed for discovery abuses is whether the district court abused its discretion. First Bank (N.A.) - Billings v. Heidema (1986), 219 Mont. 373, 711 P.2d 1384. In discussing the district courts' ability to decide when sanctions are appropriate and how severe those sanctions should be, this Court has said:

> This Court has addressed the imposition of Rule 37, M.R.Civ.P., sanctions several times in the recent past. The primary thread binding each of those decisions is the deference this Court gives to the decision of the trial judges. . . . The trial judge is in the best position to know . . . which parties callously disregard the rights of their opponents and other litigants seeking their day in court. The trial judge is also in the best position to determine which sanction is the most appropriate.

12

Dassori v. Ray Stanley Chevrolet Co. (1986), 224 Mont. 178, 179-80, 728 P.2d 430, 431.

In his March 1992 deposition, Dr. Olcott testified concerning eight problems he saw with the Eisenmenger case: (1) that Dr. Mungas used a "substandard technique" of tying the suture: (2 and 3) that there was no indication for the first surgery performed, either by symptoms or the results of the arteriogram; (4) the arteriogram and the operation should not have both been done on the same day: (5) in the second operation, Heparin was wrongly given after, not before, clamps were applied: (6) in the second operation, the arteriotomy was not completely reopened: (7) a patch was not used in redoing the arteriotomy; and (8) there was inappropriate monitoring during and following the second surgery. Dr. Olcott testified he was given the Eisenmenger case for review sometime in 1988 and that he advised Ethicon's counsel, "in general," of his opinions on these eight problems "in 1988."

In June 1990, by which date Dr. Olcott clearly had informed Ethicon's counsel of his opinion, Ethicon answered detailed discovery requests by Eisenmenger. Ethicon's answers were described by the District Court in its sanction order as "incomplete and evasive." Ethicon objected to an interrogatory about whether it took the position that Dr. Mungas failed to take the necessary precautions in using the suture, on grounds that the term "necessary precautions" was undefined. Ethicon stated that it was "unable to respond" to interrogatories about whether it contended

13

that Dr. Mungas improperly tied the suture or that any act or omission of Dr. Mungas or an employee of the hospital caused or contributed to Eisenmenger's stroke. Ethicon further stated that it was "unable to comment on the specifics of Dr. Mungas' handling of the suture and the role of that handling in explaining the suture failure."

In answer to an interrogatory asking it to set forth "each factor which you contend substantially contributed" to Eisenmenger's post-operative stroke, Ethicon responded:

> Many factors may contribute including age, history, smoking, general physical condition, wound dehiscence, and post-operative complications among many other possible factors. Ethicon intends to examine these as well as all other possibilities and may, depending on the outcome, offer expert medical opinion on this subject.

Dr. Olcott's name was first disclosed as a potential expert witness who might be called at trial on August 30, 1991. On December 9, 1991, Ethicon and its attorney made the following discovery responses:

> Interrosatory No. 1: Is it your contention that Defendant James E. Mungas caused or contributed to the injuries or damages allegedly suffered or sustained by the Plaintiff, as more fully described in her Complaint? If so, please set forth with particularity and in detail:
>
> (a) each and every fact supporting this contention;
>
> (b) the identity of any and all persons who could or would testify as to the truthfulness of this contention: and
>
> (c) the identity of all writings, notes, letter, records, or any other document which could or would support the truthfulness of this contention.

14

RESPONSE TO INTERROGATORY NO. 1:    (a) Based on its investigation of the postoperative dehiscence experienced by plaintiff following her surgery in October 1985, Ethicon contends that such dehiscence was not due to any inherent property of PROLENE* suture material or to Ethicon's manufacturing procedures or labeling information, but rather to inadvertent suture damage or mishandling during its use, the precise nature of which is unavoidably unknown to Ethicon, by one of the individuals present in the operating room at the time of surgery, or to the surgical technique employed by one of those same individuals.  Ethicon exercised no control over the suture after it left Ethicon's facility.  Ethicon was not present during the time the suture was received, stored and handled by personnel from MDMC prior to its use during the surgery in question.  Ethicon was not present in the operating room either during the initial operative procedure or the arteriotomy repair, when the suture was handled by operating room personnel! including Dr. Mungas, on multiple occasions and came into contact with a variety of surgical instruments.  Because the suture utilized in the initial closure of the arteriotomy was thrown away by Mr. [sic] Mungas, MDMC employees or other operating room personnel, Ethicon was deprived of the opportunity to examine this crucial piece of evidence, from which the cause of the dehiscence could be obtained. Moreover, because Dr. Mungas, MDMC employees or other operating room personnel did not keep track of the lot number from which the suture in question came, Ethicon was further deprived of the opportunity to demonstrate that such lot in particular met with Ethicon's manufacturing and quality control/quality assurance specifications in every respect.  Thus, although Dr. Mungas was among those present in the operating room whose suture handling or surgical technique may have inadvertently caused or contributed to plaintiff's damages, or who, directly or indirectly, may have inadvertently mishandled, misused, altered or otherwise changed the suture material in question, Ethicon cannot say that Dr. Mungas was the sole individual responsible for the dehiscence. Nevertheless, no PROLENE* 6/0 suture material returned to Ethicon following an alleged postoperative dehiscence has failed to meet USP or Ethicon specifications, and Ethicon is of the opinion that the suture in this case was within USP and Ethicon specifications and has no present information or evidence to the contrary.

(b)  All the individuals disclosed in the medical records or known to plaintiff and to Ethicon's co-

15

defendants as well as those individuals disclosed in Ethicon's responses to the parties' discovery requests and/or the depositions of Ethicon's employees in this case.

    (c) All written information produced or discovered in this case by all parties or available to the parties in the medical and scientific literature.

On the same date, Ethicon answered an interrogatory requesting information concerning the substance of and supporting facts for any expert opinions concerning mishandling, misuse, or alteration of the suture material by Dr. Mungas. In its response, Ethicon merely referred to the above answer and to its expert witness disclosure, which set forth only the names of the experts. It provided no further information.

Summary judgment was entered in favor of Dr. Mungas and the hospital some six months after Ethicon disclosed Dr. Olcott as an expert witness. During those months, Ethicon did not update its discovery responses to disclose Dr. Olcott's opinions, despite its clear duty to do so under Rule 26(e), M.R.Civ.P. Dr. Olcott was not made available to be deposed until a month after Dr. Mungas and the hospital had been dismissed from this lawsuit. By that time, severe prejudice bad already occurred to Eisenmenger, and the court had few options for appropriate and meaningful sanctions against Ethicon. As the court stated, it was "very doubtful" that Dr. Mungas's motion for summary judgment would have been made or granted if Dr. Olcott's opinion had been disclosed. Ethicon's

16

discovery abuses therefore directly interfered with a correct decision in the case.

Ethicon also argues that the evidence it withheld only inculpated Dr. Mungas, and that withholding the evidence did not prejudice Eisenmenger's case against Ethicon. However, as the District Court recognized and Ethicon admits, Ethicon would, if allowed, seek to use the concealed evidence at trial as relevant to causation. The concealed evidence clearly went to the heart of Ethicon's defense to Eisenmenger's claim.

This is not a situation where the "wrong" questions were asked in discovery and the critical answers were thereafter artfully avoided. There was nothing more which could have been asked in order to elicit from Ethicon the substance of Dr. Olcott's opinion. We conclude that the above answers to interrogatories and the failure to supplement the same demonstrate intolerable gamesmanship and obstructiveness on the part of Ethicon. Playing loose and fast with the rules of discovery, in the guise of advocacy, is equivalent to playing Russian roulette with only one chamber empty--it cannot be relied upon to lead to a favorable result.

The record supports the District Court's finding that Ethicon's failure to respond to discovery requests was willful and in bad faith. This failure caused severe prejudice to Eisenmenger on an issue central to the case. We hold that the District Court did not abuse its discretion in imposing the sanction of default judgment on the issue of liability.

17

Finally, Ethicon contends it was deprived of its right to due process through entry of the default judgment as a sanction. It argues that Securities and Exchange Commission v. Seaboard Corp. (9th Cir. 1982), 666 F.2d 414, establishes that due process allows a sanction of default judgment only in response to a complete failure to produce requested evidence. We disagree. The basis for the holding in Seaboard was that the sanction in that case was imposed for failure to obey a court order to pay a fine arising out of discovery violations. The discovery requests had been complied with by the time sanctions were imposed. Seaboard, 666 F.2d at 417. In contrast, Ethicon never fairly answered the discovery requests at issue here.

Ethicon also claims due process requires that default judgment as a sanction for discovery abuse is only proper if the refusal to respond to discovery requests gives rise to a presumption that the party had no evidence on the point in question, citing Hammond Packing Co. v. Arkansas (1909), 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530. Hammond does not establish such a blanket rule. The holding therein that the creation of such a presumption meets the requirements of due process is not equivalent to a holding that the creation of such a presumption is required for purposes of due process.

Due process requires that default may not be imposed absent willfulness, bad faith, or fault. Societe Internationale v. Rogers (1958), 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255,

18

Here, as stated above, the court found that **Ethicon's** actions in giving evasive and incomplete answers to discovery requests and in **failing** to supplement those answers "have been willful and in bad faith." In this case, the sanction of default judgment enforces due process by preventing **Ethicon** from profiting by its discovery abuse and by assuring due process to the opposing parties whose rights have been prejudiced. We hold that Ethicon's due process rights were not violated when the court ordered a sanction of default judgment on the issue of liability.

Affirmed.

_J. A. Turnage_
Chief Justice

We concur:

_John Conway Harrison_

_Fred J. Weber_

_William E. Hunt Sr._

_____

_____
Justices

Justice James C. Nelson respectfully dissents from the Court's opinion on Issue 1 and, consistent with that position, does not reach Issues 2 or 3.

While I acknowledge that the legislature's amendments to § 27-6-702, MCA, in 1985, created an ambiguity, I submit that we have erroneously resolved that ambiguity on the basis of what we perceive to be the intention of the legislature as derived from a legislative history that is, at best, inconclusive. In so doing, I suggest that we have impermissibly inserted into the tolling provisions of the statute by implication, a class of claims that the legislature did not include by specific language or, in default of that, by a clearly expressed intention. Section 1-Z-101, MCA.

In order to fully appreciate what the 1985 amendment did and did not accomplish, it is necessary to examine the amended § 27-6-702, MCA (1987), in the context of the entire Montana Medical Legal Panel Act (Act), rather than focusing, as does the Court's opinion, on simply the statute itself.'

Section 27-6-102, MCA, defines the purpose of the Act as follows:

> The purpose of this chapter is to prevent where possible the filing in court of actions against health care providers **and their employees for professional liability** in situations where the facts do not permit at least a reasonable inference of malpractice and to make possible the fair and equitable disposition of such claims **against**

---

'Unless otherwise specifically mentioned, all statutory references to the Act are to the 1987 version, since that is the version that was in effect when Eisennenger filed her malpractice claim with the panel and when she filed her second complaint against Ethicon. Also, all emphasis in the cited statutes has been supplied by the author.

**health care providers as** are or reasonably may be well founded.

Section 27-6-103, MCA, defines various terms used in the Act. Of importance here are the following:

(2) "Health care facility" means a facility . . . licensed **as a health care facility under Title 50, chapter 5.**

(3) "Health care provider" means a **physician,** a dentist, **or a health care facility.**

(4) **"Hospital"** means a hospital as defined in 50-5-101.

(5) "Malpractice claim" means any claim or potential claim of a claimant against a health **care** provider for **medical** or dental treatment, lack of medical or dental treatment, or other alleged departure from accepted standards of health **care** which proximately results in damage to the claimant, whether the claimant's claim or potential claim sounds in tort or contract, and includes but is not limited to allegations of battery or wrongful death.

(7) "Physician" means: [in pertinent part] (a)...an individual licensed to practice medicine under the provisions of Title 37, chapter 3, . . .

Section 27-6-105, MCA, provides, in pertinent part, that:

The [Montana Medical legal] panel shall review all **malpractice claims or potential claims against health care providers . . . .**

Section 27-6-302, MCA, provides, in pertinent part, that:

The application [to the panel] shall contain the following: (1) a statement in reasonable detail of the elements **of the health care provider's conduct** which are believed to constitute a malpractice **claim,** the dates the conduct occurred, and the names and addresses of all **physicians, dentists, and hospitals** having contact with the claimant and all witnesses; . . .

Section 27-G-304, MCA, provides, in pertinent part, that:

In instances where applications are received employing a theory of respondeat superior or some other derivative **theory of recovery,** the director shall forward the application to the state professional societies, associations, or licensing boards of both the individual

21

health care provider whose allegedmalpractice caused the application to be filed and the health care provider named a respondent as employer, master, or principal.

Section 27-6-502, MCA, provides, in pertinent part, that:

(1) At the time set for hearing, the claimant submitting the case for review shall be present and shall make a brief introduction of his case, including a resume of the facts constituting the alleged professional malpractice which he is prepared to prove. The health care provider against whom the claim is brought and his attorney may be present and may make an introductory statement of his case.

Section 27-6-602, MCA, provides, in pertinent part, that:

Upon consideration of all the relevant material, the panel shall decide whether there is: (1) substantial evidence that the acts complained of occurred and that they constitute malpractice: . . .

Section 27-6-701, MCA, provides that:

No malpractice claim may be filed in any court against a health care provider before an application is made to the panel and its decision is rendered.

Section 27-6-702, MCA, provides in pertinent part:

The running of the applicable limitation period in a malpractice claim is tolled upon receipt by the director of the application for review as to all health care providers named in the application as parties to the panel proceeding and as to all other persons or entities named in the application as necessary or proper parties for any court action which might subsequently arise out of the same factual circumstances set forth in the application. The running of the applicable limitation period in a malpractice claim does not begin again until 30 days after either an order of dismissal, with or without prejudice against refiling, is issued from the panel chairman, or from the director upon the consent of the parties to the claim, or the panel's final decision, whichever occurs first, is entered in the permanent files of the panel and a copy is served upon the complainant or his attorney if he is represented by counsel, by certified mail.

Reading the plain language in the Act, without referring to any past or recent legislative history, and using the terms of art

22

as those are defined in the Act, several conclusions follow:

First, the purpose of the Act is to screen and prevent the filing in court of ill-founded claims for professional acts or omissions against health care providers, which are defined to include only (i) physicians, (ii) dentists and (iii) licensed facilities. Sections 27-G-102, 27-6-103(2), (3) and (7), MCA. Ethicon, being none of those, is not an entity subject to the protection of the Act.

Second, the professional act or omission (regardless of whether the theory is tort or contract) which is to be screened is "malpractice" -- a term of art, defined in the Act as a claim or potential claim for medical treatment or other alleged departure from accepted standards of health care. Section 27-6-103(5), MCA.

The act or omission alleged to have been committed by Ethicon does not involve providing medical treatment or health care. Ethicon is alleged to have improperly manufactured a product -- specifically, a surgical suture.

Third, the panel can only consider, hear and rule upon malpractice claims filed against health care providers. Sections 27-G-105, 27-6-302, 27-6-304, 27-6-502, 27-6-602, MCA. Ethicon is neither an entity subject to the jurisdiction of the panel, nor are its alleged acts or omissions subject to panel review, as defined in the Act.

Fourth, claimants are required to submit their claim or potential claim for "malpractice" against a "health care provider" to the panel before filing the claim in court. Sections 27-6-301,

23

27-6-302 and 27-6-701, MCA. There is nothing in the Act, however, to preclude a claimant from filing a related products liability suit in court at any time within the applicable statute of limitations, since the panel has no jurisdiction or review authority over any sorts of claims, except malpractice claims.

Fifth, the tolling of the statute of limitations under § 27-6-702, MCA, obviously applies to a "... malpractice claim . . . as to all [named] health care providers...". Moreover, under the 1985 amendment, the statute of limitations is also tolled as to "... all other persons or entities named in the application as necessary or proper parties for any court action which might subsequently arise out of the same factual circumstances set forth in the application." Section 27-6-702, MCA. The critical question is, however, "for what claim is the statute of limitations tolled?"

To answer that question, it is necessary to read the phrase added by the 1985 amendment in the context of the existing qualifying language of the statute both before and after the added phrase. First, the only "claim" that is referred to in § 27-6-702, MCA, (and, in fat-t, the only "claim" referred to in the entire Act) is the claim for "malpractice," a defined term of art -- which Ethicon, by that definition, cannot commit.

Second, according to § 27-6-702, MCA, the malpractice claim is tolled:

(i) as to "health care providers," which, again, is a defined term of art which does not include Ethicon; and

(ii) "as to all other persons or entities named in the

24

application as necessary or proper parties" -- which Ethicon could be, if it could commit "malpractice" as defined by the Act.

Third, while the "court action which might subsequently arise out of the same factual circumstances" might, arguably, include a products liability claim, again, the only claim for which the statute of limitations is tolled is the malpractice claim. That conclusion is buttressed by the sentence which immediately follows the phrase added in 1985 which states that "[t]he running of the applicable limitation period in a malpractice claim does not begin again until 30 days after...". Section 27-G-702, MCA. Since the statute is very specific about when the statute of limitations on the malpractice claim begins to run again, it begs the question, assuming arguendo that claims besides the malpractice claim are tolled, when the statute of limitations on those latter claims begins to run after the panel's decision. The statute is silent on that point.

Therein lies the ambiguity. Section 27-6-702, MCA, does not specify any other claim, besides the malpractice claim, for which the statute of limitations is tolled, nor does it refer to any other claim, besides the malpractice claim, on which the applicable limitation period begins to run again after the 30 days specified in the statute has elapsed.

From a plain reading of the entire Act, in context and without resort to legislative history, one necessarily concludes that the Act, including its tolling provisions, only applies to malpractice claims involving health care providers.

25

What, then, did the 1985 amendment accomplish? It is an established rule of statutory construction that we presume that the legislature would not pass meaningless legislation, and that we must harmonize statutes relating to the same subject, giving effect to each. Montana Contractors' Ass'n, Inc. v. Department of Highways (1986), 220 Mont. 392, 395, 715 P.2d 1056, 1058. Furthermore, § 1-2-101, MCA, mandates that "[w]here there are several provisions or particulars, [in a statute] such a construction is, if possible, to be adopted as will give effect to all." Hence, the need to resort to legislative history. Under the Court's rationale, there is no other way to give effect to the added language, absent giving it the construction which this Court has on the basis of what we perceive to be the intent of the legislature as gathered from the legislative history.

Were the legislature's intent clear, I would agree with the Court's interpretation of the statute. I do not concede, however, that the legislative history is as clearly indicative of the legislature's intent in enacting the 1985 amendments as our opinion seems to suggest.

Literally, the only group of persons actually referred to in the legislative history to HB 738 (enacted as Ch. 332, L. 1985) as being included within the added tolling language, are nurses -- who, according to the legislative history, did not want to be covered by the panel. See minutes of the House Judiciary Committee hearing on HB 738, February 19, 1985. There is no discussion in the history as to what sorts of **claims** the **legislature** intended

26

would be covered under the added tolling language. The Act itself is silent as to who or what are "necessary or proper parties for any court action which might subsequently arise out of the same factual circumstances set forth in the application." Section 27-6-702, MCA. It can hardly be denied that the "factual circumstances" before the panel deal with malpractice. At most, it appears that the legislature arguably intended to toll the statute of limitations as to employees of the health care provider, e.g. nurses.

If it was the legislature's intention, by enacting the additional phraseology in § 27-6-702, MCA, to bring persons or entities other than health care providers within the tolling provisions of the statute, then the legislature merely needed to broaden the scope of the statute to include <u>claims other than malpractice claims</u>. Unfortunately, it failed to do that.

What the legislature did was change only one part of the statute -- it expanded the tolling provisions of the statute to include "...other persons or entities named in the application as necessary or proper parties...", but it left the only claims tolled as being those in "malpractice" which, by definition, cannot be committed for purposes of the Act by persons or entities who are not physicians, dentists and health care facilities.

On balance, given the existing qualifying language preceding and following the language which was added by the legislature in 1985 to § 27-6-702, MCA; reading that section in the context of the entire Act: and given that the 1985 legislature made a number of

27

other changes in the Act, it seems more appropriate to conclude that if the legislature intended to include all parties and all claims within the tolling provisions of the statute, that it would have made the necessary changes in other provisions of the Act to clearly effect that intention which we now find implicit in the legislative history. I have difficulty in reading into the statute language which broadens the types of claims tolled on the basis of divining legislative intent from a legislative history that is, at best, inconclusive.

It should be apparent that the statutory amendment suffers from some major drafting flaws which provide a trap for the unwary. Plaintiff understandably relied on what the statute, at quick perusal, seems to say. Similarly, Ethicon can hardly be faulted for reading the statute with a great deal more care than that with which the amendment was drafted. But for the District Court's and this Court's generous interpretation of the amended language to give effect to what is the perceived legislative intent behind the 1985 amendment, plaintiff would be out of court. The Court's interpretation of the statute saves plaintiff's case, but the language added to § 27-6-702, MCA, still remains ambiguous, confusing and out of context with other provisions of the Act.

Hopefully, § 27-6-702, MCA, will be further amended and the legislature's intent, whatever that actually is, will be made clearly evident in the language of the statute itself.

_____
Justice

28