No. 93-400

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

GARY D. FJELSTAD, as Conservator of
MAREIA ELLEN FJELSTAD, a Protected Person,

      Plaintiff, Respondent,
      and Cross-Appellant,

v.

STATE OF MONTANA, Acting Through its
Department of Highways,

      Defendant, Appellant,
      and Cross-Respondent.

FILED

OCT 25 1994

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

---

APPEAL FROM:    District Court of the Sixteenth Judicial District,
                In and for the County of Treasure,
                The Honorable Kenneth R. Wilson, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

           R. H. Bellingham, T. Thomas Singer, and
           Harlan B. Krogh, Moulton, Bellingham,
           Longo & Mather, Billings, Montana

      For Respondent:

           Donald W. Molloy, Molloy Law Offices,
           Billings, Montana

           Theodore R. Dunn, Goetz, Madden & Dunn,
           Bozeman, Montana

           Lee R. Kerr, Kerr Law Office, Hysham, Montana

---

                Submitted on Briefs:  February 10, 1994

                        Decided:  October 25, 1994

Filed:

---

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

Plaintiff Gary D. Fjelstad commenced this action in the District Court of the Sixteenth Judicial District in Treasure County to recover damages for personal injuries sustained by his daughter Mareia as a result of an automobile collision that occurred on December 18, 1988. Following trial, a Treasure County jury returned its verdict in favor of defendant State of Montana, finding that it was not negligent. Fjelstad moved for a new trial based on insufficiency of the evidence to support the jury's verdict and based on newly discovered evidence which the State had known of prior to trial but had not disclosed. Fjelstad also moved the District Court to impose sanctions against the State because of its failure to disclose the newly discovered evidence in response to prior discovery requests. The District Court granted Fjelstad's motion for a new trial, but denied his motion for sanctions. The State appeals from the District Court's order granting a new trial. Fjelstad cross-appeals from the District Court's order which denied his motion for the imposition of sanctions. We affirm the District Court's order granting a new trial and remand for further proceedings regarding the issue of sanctions.

The issues raised by the parties are as follows:

1.    Did the District Court abuse its discretion when it granted Fjelstad's motion for a new trial based on newly discovered evidence pursuant to M. R. Civ. P. 60(b)?

2

2.    Did the District Court abuse its discretion when it granted Fjelstad's motion for a new trial pursuant to M. R. Civ. P. 59, and § 25-11-102, MCA, based on insufficiency of the evidence to support the jury's verdict?

3.    Did the District Court err when it refused to impose sanctions pursuant to M. R. Civ. P. 26(g), for defendant's failure to disclose material evidence in response to written interrogatories?

## FACTUAL BACKGROUND

On December 18, 1988, Ellen Fjelstad was operating her motor vehicle in a westerly direction on Interstate Highway 94 at a point approximately 9.7 miles east of Custer in Treasure County, Montana. For some reason, Ellen's attention was distracted from the highway, she swerved to her right, left the highway, and struck the end of a guardrail while attempting to correct her vehicle and return to the highway.

The guardrail with which Ellen collided included a concrete endpost reinforced with steel and was anchored to the ground by a steel cable attached to buried concrete. Ellen's car struck the concrete post, hooked onto the cable and flipped over on top of the guardrail so that it was upside down and facing east. Ellen and Jessica Simenson, a two-year-old passenger in the rear seat, were killed as a result of the collision. Ellen's daughter, Mareia, who was a passenger in the front seat of the vehicle was thrown from

3

the vehicle for a distance of approximately 50 feet and sustained severe head injuries.

Mareia's father, Gary, commenced this action against the State of Montana to recover damages which Mareia has sustained because of her injuries. In his complaint, Gary Fjelstad alleged that the guardrail with which his wife Ellen collided was negligently designed, installed, and maintained by the State of Montana, and that the State's negligence was a cause of Mareia's injuries.

The State denied that it was negligent and alleged that its conduct with regard to the guardrail conformed to the applicable standard of care at all times prior to the date of this accident.

To understand the nature of Gary Fjelstad's claim, and the basis for the District Court's order granting a new trial, it is necessary to briefly summarize the history of guardrail end treatment in Montana in general, and the history of the involved guardrail in particular.

Interstate Highway 94 through Montana was constructed in 1962. Guardrail was and is used along various locations of the highway to help prevent accidental runoff from the highway and reduce the frequency of physical injury and property damage. However, it was conceded by the Department of Highways that a guardrail itself constitutes a hazard on the highway and that the end treatment of guardrails has evolved over the years out of concern for the hazard it presents. The first guardrails constructed along Interstate 94 used an end known as a "blunt end." It is more accurate to say the

4

original guardrails involved no treatment at all. The guardrail simply ended. That type of design presented a hazard when struck by vehicles because the rail would enter the passenger compartment of the car and spear the passenger or driver.

During the early 1960s, the state of Texas developed a guardrail end treatment known as the Texas twist. That design featured an end treatment which was twisted 90 degrees and anchored to the ground. It provided several advantages. First, it anchored the entire length of the rail to provide greater longitudinal strength and resistance to damage from collision. Second, the design was more crash worthy than the blunt end because there was no rail with which colliding vehicles could be speared. The Texas twist was adopted by Montana as its standard for guardrail end treatment in 1967 and remained the State's standard until 1971. Although the date is unclear from the record, a Texas twist end treatment was constructed at the scene of Ellen Fjelstad's fatal accident in the Hysham hills sometime prior to 1971 and remained there until it was replaced by a buried anchor end treatment in 1977.

In 1971, Montana adopted the buried anchor end treatment as its standard. This design is also referred to as the California end anchorage, indicating the state in which it was developed. This design is similar to the blunt end treatment originally used in Montana. However, additional tensile force was provided by anchoring the guardrail to a concrete slab placed in the ground a

5

few feet from the endpost. The guardrail and the concrete slab were connected by a steel cable attached to the buried concrete slab and connected to the rail between the first and second posts. The buried anchor end treatment was adopted from a California standard which required that the endpost be composed of wood and that the end treatment be flared away from the road so that it was located beyond the clear zone or at least 30 feet from the fog line on the highway. However, when the buried anchor end treatment was installed at the scene of Ellen Fjelstad's collision, the endpost was constructed from concrete reinforced with steel bars and was located only 20 feet from the travelled portion of the highway.

In the mid-1970s, highway designers began development of an end treatment for guardrails know as the "break away cable treatment" (BCT). The BCT was developed to improve the crash worthiness of guardrail end treatments and became the adopted standard for Montana on June 1, 1979. The BCT provided stability to the guardrail by use of longitudinal tension provided by a steel cable which passed through and attached to the first post. However, the first and several subsequent posts are designed to be constructed of wood so that they break away on impact. In theory, when the first post breaks the cable is released and the rail should buckle more easily during impact and reduce the likelihood of spearing the passenger compartment of the vehicle. The State's experts agreed that penetration of a vehicle with the BCT end treatment is less frequent than with the buried anchor design.

6

They further agreed that the dynamics of Ellen Fjelstad's accident and the forces which caused Mareia's injuries would have been different had the BCT been in place at the accident scene in 1988.

In 1984, after the BCT was adopted as the standard for guardrail end treatments in Montana, the State Highway Department engaged in an overlay project on the stretch of highway where Ellen's accident occurred. In an overlay project, an asphalt mat is placed on top of the roadway to preserve the riding surface. The State offered evidence that while they would occasionally raise guardrails during an overlay project to maintain the necessary height above the travelling surface of the roadway, it was not the State's policy in 1984 to upgrade end treatments on guardrails to conform to existing standards. However, that policy changed on August 20, 1986, when Steven C. Kologi, a pre-construction engineer for the Montana Department of Transportation, signed a memorandum to the Federal Highway Administration indicating that on future resurfacing projects the State would upgrade all guardrail end treatments for break away cable treatment. That change was to be effective January 1, 1987.

At trial, Gary Fjelstad alleged that the State Department of Highways was negligent in several respects with regard to the end treatment that existed at the time of Ellen's accident.

1. He alleged that the State was negligent for switching from the "Texas twist," which provided crash worthy features, to the "buried anchor" treatments, which had no crash worthy features;

7

2.    He contended that the State was negligent for failing to replace the unsafe buried anchor treatment with the break away cable treatment during the overlay project which occurred during 1984; and

3.    He contended that, even if you assume that the buried anchor treatment was reasonable when installed, the State was negligent for using a reinforced concrete endpost and constructing the dangerous end treatment within the 30 foot "clear zone" recommended by the standard from which the buried end treatment was adopted.

The State, on the other hand, defended on the basis that the Texas twist presented hazards unique to its design; that the federal government at one time encouraged use of the buried anchor design; and that it was not unreasonable to retain that design in 1984 during the overlay project. By its verdict, the jury agreed.

## PRETRIAL DISCOVERY

Prior to trial, Fjelstad submitted written interrogatories and requests for production to the State. Interrogatory No. 33 was as follows:

> Prior to the date of the accident alleged in the complaint, did any person, organization or any of your employees recommend or advise any repairs, alterations, or changes in guardrails on any interstates in Montana which did not meet standards which were current as of that date? If so, for each recommendation, state:
>
> a.    The name of the person, organization or employee;
> b.    The date made;
> c.    What the recommendation or advice was;
> d.    Whether any action was taken by you as a result of such recommendation or advice;

8

e.    The action taken.

On March 20, 1991, the State provided the following objection and answer to Fjelstad's interrogatory:

> Defendant objects to this interrogatory on the grounds that it is overbroad, unduly burdensome and oppressive. To answer this interrogatory fully would require this defendant to question every employee who has ever worked for the State of Montana. Without waiving its objections, defendant states that a reasonable search of the record has revealed no complaints responsive to this request.

The State's answer to Interrogatory No. 33 was never amended prior to trial.

Prior to trial, Fjelstad scheduled depositions of several Highway Department officials. Served with their notices of deposition were subpoenas duces tecum requiring that they produce at the time of their deposition, "any and all documents . . . which relate, pertain, or refer to the guardrail design, replacement, or assessment located at Montana interstate highway 94, 9.7 miles east of Custer. . . . " Neither of the documents which were the subject of the District Court's order granting a new trial were produced in response to those subpoenas.

## POST-TRAIL DEVELOPMENTS

The trial of this case began on March 17, 1993, and the jury returned its verdict in favor of defendant on March 19. The jury, by its verdict, found that defendant was not negligent by its installation or maintenance of the guardrail end treatment with which Ellen Fjelstad collided. Judgment was entered for the State on March 29, 1993.

9

On April 5, 1993, pursuant to M. R. Civ. P. 59, and § 25-11-102, MCA, Fjelstad moved for a new trial based on the insufficiency of the evidence to support the jury's verdict. The basis for that motion was that the State's employees admitted that when they adopted the buried anchor end treatment as its standard in 1971, its standard was patterned after design requirements which were not followed in this case.

On April 28, 1993, Fjelstad filed a second motion entitled "Motion for Relief from Judgment and for Sanctions" pursuant to M. R. Civ. P. 60(b) and 26(g). The basis for his Rule 60(b) motion was that subsequent to trial he discovered relevant evidence which had been in the State's possession prior to trial and which would have been beneficial to his case but which was not disclosed by the State, in spite requests for its identification and production. In support of that motion, Fjelstad filed the affidavit of his attorney who stated that while discussing this case with another Montana attorney following trial, he was provided by that attorney with documents discovered from the State in another case which related to the issue of upgrading guardrails during overlay projects. Those documents, which were attached to that affidavit, included a November 21, 1978, memorandum from the Director of Engineering for the Federal Highway Administration's Department of Transportation to regional Federal Highway Administrators and a December 13, 1978, letter from the Federal Highway Administration's Division Administrator to the Director of the Montana Department of

10

Highways, which passed on a copy of the November 21, 1978, memorandum. The November 21, 1978, memorandum related to upgrading guardrail installations during overlay projects and stated in relevant part that:

> The purpose of this memorandum is to remind personnel responsible for project program and PS&E reviews, construction and final inspections, and maintenance inspections that they should be vigilant for the need to adjust guardrails or other highway appurtenances. They should also be alert to opportunities to upgrade obsolete barrier installations . . . . [Emphasis added.]

The December 13, 1978, cover letter from the Federal Division Administrator to Montana's Director of the Department of Highways stated in relevant part that:

> When construction and maintenance forces add overlays it is important that the guardrail be corrected to the proper height. Existing substandard guardrails should be upgraded wherever possible. Please take appropriate action necessary to alert your personnel of the importance of obtaining standard guardrail installations. . . . [Emphasis added.]

Fjelstad argued that the withheld documents supported his contention that the reasonable practice in 1984, when the Hysham Hills overlay project was completed, was to upgrade substandard guardrail end treatments and that disclosure of the documents would have, in all likelihood, changed the outcome of this trial. He also contended that since the State had these documents in its possession since 1978, and was sufficiently aware of them to disclose them in another case, the State's failure to do so in this case violated M. R. Civ. P. 26(g) because the State's response to

11

Interrogatory No. 33 was interposed for an improper purpose and will cause Fjelstad the undue burden and expense of a second trial.

In response to Fjelstad's Rule 60(b) motion the State acknowledged that on March 10, 1992, nearly one year prior to trial, Carl S. Peel, assistant pre-construction engineer for the Department of Highways, faxed the two documents in question to counsel for defendant but contended that since the documents related only to guardrail height requirements, counsel for defendant correctly concluded that they were irrelevant when he withheld them.

On May 25, 1993, the District Court granted Fjelstad's motion for a new trial based on both the insufficiency of the State's evidence and the discovery of new evidence. In its order, the District Court found that the documents in question were directly related to Fjelstad's discovery requests, were known to the State since 1978, and had been provided to defendant's attorney more than one year prior to trial. The District Court, furthermore, found: that Fjelstad exercised diligence in his efforts to discover the information prior to trial; that given the State's position, he was unable to discover the documents prior to trial; and that had the documents been provided, the outcome of the trial, in all probability, would have been different.

Without explanation, plaintiff's motion for sanctions pursuant to Rule 26(g) was denied.

12

## I

Did the District Court abuse its discretion when it granted Fjelstad's motion for a new trial based on newly discovered evidence pursuant to M. R. Civ. P. 60(b)?

We have previously held that, "[t]he decision to grant a new trial is within the sound discretion of the trial judge and will not be overturned absent a showing of manifest abuse of discretion." *Stanhope v. Lawrence* (1990), 241 Mont. 468, 471, 787 P.2d 1226, 1228. We have recently reiterated the "manifest abuse of discretion" standard in *Jim's Excavating Service, Inc. v. HKM Associates* (Mont. 1994), 878 P.2d 248, 259, 51 St. Rep. 623, 631.

In cases that are more on point, we have previously held that the standard of review of a district court order granting a new trial based on newly discovered evidence is simply whether the district court abused its discretion. In *State v. Lewis* (1978), 177 Mont. 474, 483, 582 P.2d 346, 352, we held that "the matter of granting or refusing a new trial for newly discovered evidence rests largely in the discretion of the District Court. . . ." (Citation omitted.)

Whether or not we specifically intended a less demanding standard of review for orders granting a new trial based on newly discovered evidence, than from orders granting a new trial on some other basis, is unclear. However, for the purpose of consistency we will review the District Court's order in this case granting Fjelstad's Rule 60(b) motion, and we will review future orders

13

granting a new trial based on newly discovered evidence consistent with the "manifest of abuse of discretion" standard most recently set forth in *Jim's Excavating Service*.

Rule 60(b) provides in relevant part that:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); . . . [t]he motion shall be made within a reasonable time, and for reasons (1), (2), and (3) when a defendant has been personally served . . . not more than 60 days after the judgment, order or proceeding was entered or taken, or, in a case where notice of entry of judgment is required by Rule 77(d), not more than 60 days after service of notice of entry of judgment.

Our prior decisions establish additional criteria for the consideration of Rule 60(b)(2) motions. We have held that the factors which must be considered by the District Court include:

1. The alleged "newly discovered" evidence came to a party's knowledge after the trial;

2. It was not a want of diligence which precluded its earlier discovery;

3. The materiality of the evidence is so great it would probably produce a different result on retrial; and

4. The alleged "new evidence" is not merely cumulative, and not tending to impeach or discredit witnesses in the case.

*See Kerrigan v. Kerrigan* (1943), 115 Mont. 136, 144-45, 139 P.2d 533, 535; *Kartes v. Kartes* (1977), 175 Mont. 210, 214, 573 P.2d 191, 193; *Barmeyer v. Montana Power Company* (1983), 202 Mont. 185, 203, 647 P.2d 594, 603.

14

In this case, the State does not deny that the evidence first came to Fjelstad's attention after trial, nor does the State contend that by the exercise of diligence he could have discovered it sooner. On appeal from the District Court's order, the State argues that Fjelstad failed to satisfy the last two requirements for a new trial based on newly discovered evidence.

Specifically, the State contends that (1) the newly discovered documents related only to guardrail height, not to end treatments, and therefore, were not material; (2) if material, the documents were merely cumulative of the State's own guidelines and recommendations to which the State subscribed; and (3) for the previous two reasons, there was no reasonable probability that the newly discovered documents would produce a different result if this case is retried.

Based upon our independent review of the pre-trial discovery, the trial transcript, and the respective positions of the parties as expressed throughout these proceedings, we disagree with the State's argument.

First, it is clear that the recommendations included in the documents generated by the federal government pertain to more than simply guardrail height. The November 21, 1978, memo from the Federal Highway Administration was for the stated purpose of reminding highway personnel that "they should also be alert to opportunities to upgrade obsolete barrier installations" and refers State personnel to the AASHTO (American Association of State

15

Highway and Transportation Officials) "Guide for Selecting, Locating, and Designing Traffic Barriers" for that purpose. By that time the AASHTO guide specifically recommended the installation of break away cable design for guardrail end treatment. Furthermore, the Federal Highway Administration's December 13, 1978, memo specifically stated that when overlays are added to existing highways, "substandard guardrails should be upgraded whenever possible." There was no suggestion in the government's memorandum that only those guardrails which are substandard due to their height needed to be upgraded. Second, the evidence was not cumulative of the State's own standards or those standards established by the AASHTO. The State's witnesses plainly testified that the State had no policies requiring that guardrail end treatments be upgraded until 1986, and that while it occasionally considered AASHTO guidelines, it was not the State's policy to routinely follow them.

Instead, the State's witnesses testified that its decisions were more routinely dictated by the Federal Highway Administration and even implied that the FHA approved its failure to upgrade the guardrail end treatment from the buried anchor design that was in place at the time of its overlay project in 1984.

Kologi, who at the time of trial was in charge of planning functions for the Department of Transportation and worked for that department as a pre-construction engineer until 1989, testified that the State originally went to the buried anchor treatment based

16

on the recommendations of the Federal Highway Administration. He explained that recommendations from the FHA were significant to all of the States' design decisions because on the interstate highway system the federal government paid a little more than 90 percent of the cost.

Kologi testified that anytime there were improvements to portions of the interstate highway system in Montana, the drawings for those improvements had to be submitted to the Federal Highway Administration for their approval. He also stated that Montana originally abandoned the Texas twist end treatment because they were being leaned on by the FHA.

Therefore, we conclude that subsequently discovered evidence which indicated that contrary to Montana's policy, the Federal Highway Administration had recommended prior to 1984 that guardrail end treatments be upgraded during overlay projects, was neither cumulative nor did it simply tend to impeach the State's witnesses.

Third, we conclude from our review of the record that there is substantial evidence to support the District Court's conclusion that the newly discovered evidence would probably produce a different result on retrial. The State defended against Gary Fjelstad's claim on the bases that: the guardrail end treatment about which he complained had been installed at the suggestion of the federal government; that it was bound to follow the federal government's recommendations in order to obtain federal funding; and that the federal government approved its 1984 overlay project

17

knowing that a noncrash worthy end treatment would not be upgraded. It can hardly be questioned that that evidence was significant to the jury's finding that the State was not negligent. Nor can it be questioned that the jury would have given less weight to that evidence had it known that five and one-half years prior to the 1984 overlay project the State had been instructed by that same Federal Highway Administration to upgrade obsolete barrier installations to conform with the AASHTO guidelines which by then called for the installation of break away cable end treatment.

For these reasons, we conclude that there has been no showing of manifest abuse of discretion by the District Court when it set aside the judgment entered in favor of the State of Montana and granted Gary Fjelstad's motion for a new trial pursuant to M. R. Civ. P 60(b)(2).

II

Did the District Court abuse its discretion when it granted Fjelstad's motion for a new trial pursuant to M. R. Civ. P. 59, and § 25-11-102, MCA, based on insufficiency of the evidence to support the jury's verdict?

Based on our discussion in the previous section, and our holding which affirms the District Court's order granting a new trial based on newly discovered evidence, we see no need, and therefore, decline to discuss whether a new trial was also warranted based on insufficiency of the evidence.

18

## III

Did the District Court err when it refused to impose sanctions pursuant to M. R. Civ. P. 26(g) for defendant's failure to disclose material evidence in response to written interrogatories?

Fjelstad moved for the imposition of sanctions against the State of Montana pursuant to Rule 26(g), which pertains to inaccurate discovery responses, and provides in relevant part that:

> The signature of the attorney or party constitutes a certification that the signer has read the request, response, or objection and that to the best of the signer's knowledge, information, and belief formed after a reasonable inquiry it is: (1) consistent with these rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; (2) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation. . . .
>
> If a certification is made in violation of the rule, the court upon motion or upon its own initiative, shall impose upon the person who made the certification . . . an appropriate sanction. [Emphasis added.]

In its order granting Fjelstad's motion for a new trial, the District Court found that the newly discovered documents were "directly related" to the information sought by Fjelstad's written Interrogatory No. 33 and further stated

> that the documents, were known to the [State] . . . since 1978 and were produced by "fax" transmission to the lawyers for the State in this litigation . . . more than a year before trial and well before depositions were taken of the State's witnesses. The State's witnesses were questioned during depositions about the existence of a written documents [sic] regarding upgrade of guardrails during overlay projects. They were also asked about the

19

federal government's role in the guardrail installation and upgrade process. Despite having the documents they were not produced by the State. The Court believes they should have been produced.

The plaintiffs exercised diligence before trial and did not get the documents at issue when they should have been produced. The record shows that the evidence was not discovered, nor could it have been, given the position of the defendant, before the trial. The court believes the documents would have altered discovery, would have led to the disclosure of different or additional witnesses, and would have changed the course of the trial . . . [and] that the outcome of the trial probably would have been different.

The plaintiff's motion for imposition of sanctions is denied.

Although we have previously affirmed the imposition of sanctions pursuant to Rule 26(g), *see Jerome v. Pardis* (1989), 240 Mont. 187, 783 P.2d 929; *Eisenmenger v. Ethicon* (1994), 264 Mont. 393, 871 P.2d 1313, and although we have held in *Eisenmenger* that our standard of review from an order imposing sanctions for discovery abuses is whether the District Court abused its discretion, we have not previously articulated a standard of review from a district court order which denies the imposition of sanctions pursuant to Rule 26(g). Furthermore, there are few decisions from other jurisdictions applying Rule 26(g) since its inclusion in the Federal Rules of Civil Procedure in 1983. There are, however, several cases to which we look for guidance.

In *Clipse v. State* (Wash. Ct. App. 1991), 808 P.2d 777, the Washington Court of Appeals affirmed the imposition of sanctions pursuant to Rule 26(g) based upon the plaintiff's misleading and

inaccurate disclosure of expert witnesses. Quoting the Advisory Committee Notes (1983), 97 F.R.D. 165, the court noted that the rule "imposes on the attorney a duty to make a 'reasonable inquiry' into the factual basis of a response, request, or objection . . ." and that "what is reasonable is a matter for the court to decide on the totality of the circumstances." *Clipse*, 808 P.2d at 779. The court further noted that an objective test is applied and that "[a]lthough the nature of the sanction is a matter of judicial discretion, the rule mandates imposing sanctions if they are appropriate under the rule." *Clipse*, 808 P.2d at 779 (emphasis added).

The Washington Supreme Court elaborated upon this standard in *Washington State Physicians Exch. & Ass'n v. Fisons Corp.* (Wash. 1993), 858 P.2d 1054. That court held that, in addition to application of an objective standard to determine whether an attorney has made a reasonable inquiry, the trial court should determine

> whether an attorney has complied with the rule . . .
> [and] consider all the surrounding circumstances, the
> importance of the evidence to its proponent, and the
> ability of the opposing party to formulate a response or
> to comply with the request.

*Fisons*, 858 P.2d at 1078,

The court further noted that:

> In applying the rules to the facts of the present
> case, the trial court should have asked whether the
> attorneys' certifications to the responses to the
> interrogatories and requests for production were made
> after reasonable inquiry *and* (1) were consistent with the
> rules, (2) were not interposed for any improper purpose,

21

and (3) were not unreasonable or unduly burdensome or expensive.

Instead, the trial court considered the opinions of attorneys and others as to whether sanctions should be imposed. This was error. . . . It is the responsibility of the court deciding a sanction motion to interpret and apply the law.

*Fisons*, 858 P.2d at 1078. As noted in *Pardis*, 783 P.2d at 922, Montana adopted M. R. Civ. P., 26(g) "in 1984 along with the amendments to its parallel, Rule 11, M.R.Civ.P., which governs abuses in pleadings and motion practice." For that reason, it is appropriate to look to our standard of review from orders denying Rule 11 sanctions for guidance in this case. That standard, as set out in *D'Agostino v. Swanson* (1990), 240 Mont. 435, 446 784, P.2d 919, 926, states that: (1) the district court's findings of fact will not be overturned unless clearly erroneous; (2) the district court's conclusion that the facts constitute a violation of Rule 11 will not be reversed absent an abuse of discretion; (3) review *de novo* is appropriate only if the violation is based upon the legal sufficiency of a plea or motion; (4) if Rule 11 has been violated the district court must impose sanctions on the offending party, his counsel, or both; and (5) failure to impose sanctions where the Rule has been violated will be deemed reversible error.

We have held, however, that the type of sanction imposed for violation of Rule 11 is uniquely within the discretion of the district court. *D'Agostino*, 784 P.2d at 919.

22

Moreover, the notes of the Advisory Committee for the 1983 Amendments to the Federal Rules of Civil Procedure make clear the mandatory nature of sanctions where the elements of Rule 26(g) have been satisfied. Those notes provide that:

> Because of the asserted reluctance to impose sanctions on attorneys who abuse the discovery rules . . . Rule 26(g) makes explicit the authority judges now have to impose appropriate sanctions and requires them to use it. . . . The new rule mandates that sanctions be imposed on attorneys who fail to meet the standards established in the first portion of Rule 26(g). The nature of the sanction is a matter of judicial discretion to be exercised in light of the particular circumstances.

97 F.R.D. 165, 220 (emphasis added).

Therefore, we adopt the following standard of review from a district court's order denying sanctions pursuant to Rule 26(g):

1. The district court's findings of fact will not be overturned unless clearly erroneous.

2. The district court's conclusion that the facts do or do not constitute a violation of Rule 26(g) will not be reversed absent an abuse of discretion.

3. If the district court concludes that Rule 26(g) has been violated, sanctions must be imposed upon the offending party and failure to do so will be deemed reversible error.

4. The nature and extent of sanctions imposed by the district court pursuant to a violation of Rule 26(g) will not be reversed absent an abuse of discretion.

In this case, we are unable to review the District Court's order denying Fjelstad's motion for sanctions because the District

23

Court did not enter findings specifically pertaining to Rule 26(g), and did not draw any conclusion whether the rule was or was not violated. Therefore, we vacate that part of the District Court's order which denied Fjelstad's motion for the imposition of sanctions against the State of Montana pursuant to M. R. Civ. P. 26(g), and remand this case to the District Court for more specific findings and its conclusion whether Rule 26(g) was or was not violated under the circumstances in this case.

The order of the District Court granting plaintiff Gary Fjelstad's motion for a new trial is affirmed. The order of the District Court denying Fjelstad's motion for sanctions pursuant to Rule 26(g) is vacated and this matter is remanded to the District Court for further proceedings consistent with this opinion.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

24

October 25, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:


Randy H. Bellingham, Esq. & Harlan B. Krogh, Esq.
Moulton, Bellingham, Longo & Mather, P. C.
P.O. Box 2559
Billings, MT 59103

Donald W. Molloy, Esq.
Molloy Law Offices
P.O. Box 1617
Billings, MT 59103-1617

Lee R. Kerr
Kerr Law Office
P.O. Box 72
Hysham, MT 59038

Theodore R. Dunn and Richard Dolan
Goetz, Madden & Dunn
35 North Grand
Bozeman, MT 59715


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy