No. 99-019

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 41

298 Mont. 312

994 P. 2d 1139

IN THE MATTER OF THE ESTATE OF

CHARLES LAUREN MILES,

Decedent,

v.

GARRY NORVAL MILES, LAWRENCE

MILES, RONALD KAY MILES AND

KENNETH LAUREN MILES, HEIRS TO

THE ESTATE OF CHARLES LAUREN MILES,

Heirs/Appellants,

MS. PATSY JOAN MILES,

Personal Representative/Respondent.

APPEAL FROM: District Court of the Sixth Judicial District,

In and for the County of Park,

The Honorable Wm. Nels Swandal, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Brian F. Close, Bozeman, Montana

For Respondent:

Kevin S. Brown, Paoli & Brown, Livingston, Montana; Karl Knuchel, Livingston, Montana

Submitted on Briefs: May 27, 1999
Decided: February 15, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1.Appellants Garry Norval Miles, Lawrence Miles, Ronald Kay Miles, and Kenneth Lauren Miles are the children of the deceased, Charles Lauren Miles. The children are appealing various rulings of the District Court for the Sixth Judicial District, Park County, in connection with their father's estate. We affirm and remand for further proceedings consistent with this Opinion.

¶2.The following issues are raised on appeal:

¶3. Did the District Court err as a matter of law in ruling that annuity contracts are not insurance under Montana law?

¶4. Did the District Court err as a matter of law in ruling that the decedent's children are

not interested persons under § 72-1-103(25), MCA?

¶5. Should this Court, in exercising its authority over the bar, require that probate fees be charged on an hourly basis?

¶6. Did the District Court err in denying discovery of the records of the personal representative and her attorneys?

¶7. Did the District Court err as a matter of law in refusing to sanction the estate's attorneys and, instead, sanctioning the Heirs' attorney.

## Factual and Procedural Background

¶8.Charles Lauren Miles (Charles) died on June 10, 1997. In a will drafted in 1982, Charles provided that, in the event of his death, all of his property passes to Patsy Joan Miles (Patsy), his ex-wife. He also nominated Patsy as personal representative. Under Article II of the will, all estate expenses were to be deducted from the balance of any insurance proceeds. Article V of the will provided that 50% of the balance of any insurance proceeds payable upon death shall go to Garry Norval Miles, Lawrence Miles, Ronald Kay Miles, and Kenneth Lauren Miles (the Heirs), Charles' four children from a previous marriage, with the remaining 50% payable to Patsy.

¶9.Charles had purchased a $20,000 term life insurance policy through Veteran's Group Insurance Trust on March 10, 1981. A few months later, he added an additional $4,000 in term life insurance coverage to the policy. This insurance policy was in effect when Charles drafted his will in 1982.

¶10.On May 27, 1994, Charles paid $30,000 for a tax deferred variable annuity contract issued by Hartford Life Insurance. The annuity contract provided that the funds would be managed by Putnam Investments and the Putnam Capital Manager. Charles directed that 25% of the $30,000 be allocated to a Putnam Capital Management "Global Growth Fund" and the remaining 75% be allocated to a "Growth and Income Fund." In applying for this annuity, Charles responded "no" to a question asking whether the annuity would replace one or more existing annuity or life insurance contracts.

¶11.In a cover letter sent to Charles upon entering into the contract, Putnam informed Charles:

Through your investment in Putnam Capital Manager, you are now participating in a tax-deferred variable annuity program with a wide selection of variable funds managed by Putnam Investments . . . .

We believe that Putnam Capital Manager will help you meet your need for tax-deferred growth of capital . . . . You may also use investease--the Systematic Investment Plan.

. . .We look forward to helping you reach your investment objectives over the coming years.

¶12.Under the terms of an amendatory rider, Charles had an annual withdrawal privilege, without penalty, of 10% during the first seven contract years and 100% of the contract value after year seven. In addition, Charles had the right to withdraw the balance of the contract subject to a surrender charge. The surrender charge started at 7% for amounts withdrawn in year one, sliding down to 0% for withdrawals after year seven. The annuity contract provided for a refund of any remaining balance upon Charles' death. At the time of his death, the balance in the annuity was $52,167.91.

¶13.Charles left a gross estate valued for Federal Estate Tax purposes at $580,351. Patsy voluntarily disclaimed $120,000 of Charles' IRA so that those proceeds could be distributed to the Heirs. Patsy also voluntarily disclaimed approximately $24,955 worth of personal property to the Heirs. Nevertheless, the Heirs demanded one half of the annuity investment claiming that they were entitled to that amount under Charles' will. The estate denied their claim on the grounds that the annuity investment funds were not "insurance proceeds payable upon death" as specified in the will.

¶14.On September 2, 1998, the District Court held a hearing on whether the annuity funds constituted insurance proceeds payable upon death for purposes of estate distribution. After listening to testimony from various experts, the court took the matter under advisement.

¶15.Although the District Court had not yet ruled on whether the annuity funds were insurance proceeds, the Heirs demanded that Patsy, as personal representative, account for any and all fees which would be paid out of the annuity fund in the event the court ruled that those funds were indeed insurance proceeds. On September 9, 1998, the Heirs' attorney, Brian Close, filed a motion and brief under Rule 11, M.R.Civ.P., accusing the estate's attorney, Kevin Brown, of making false statements of law. In addition, Close

informed the court that the Heirs intended to file an action against Brown with the State Bar disciplinary committee.

¶16. On September 23, 1998, the estate received a discovery request from Close demanding that Brown turn over copies of his law school grades, academic transcripts and final class ranking. Brown was an associate in the Fred Paoli, Jr. law firm. Although Paoli had never appeared on behalf of the estate or billed the estate for his services, Close demanded that Paoli identify the dates he was absent from Livingston since June 10, 1997. Close also demanded that Brown, Paoli and attorney Karl Knuchel, who was assisting Brown in the case, state whether they had ever had a complaint lodged against them with any bar disciplinary committee and to give the details of any such complaint. In response, Brown sent the Heirs a letter giving them seven days to withdraw their discovery requests or face a motion for a protective order and for sanctions.

¶17. Rather than comply, Close submitted a brief to the District Court on September 25, 1998, wherein he claimed that Brown was "little more than a glorified paralegal." Close also accused Patsy and the estate's attorneys of converting estate funds for their own use; committing legal malpractice; cheating the estate; and "practicing in the worst traditions of the bar." Close stated that he intended to refer the estate's attorneys to the "Disciplinary Committee" at the end of the estate proceedings. Consequently, Brown filed a motion in the District Court on September 30, 1998, for a protective order and for sanctions against Close for the harassing and vexatious discovery demands and for the unfounded accusations of fraudulent and unethical behavior leveled against him by Close.

¶18. On October 13, 1998, Close submitted a 27-page brief wherein he openly accused opposing counsel of violating Rule 11, M.R.Civ.P., and the Rules of Professional Conduct by making knowing misrepresentations to the District Court. In his brief, Close called opposing counsel "unscrupulous members of the bar" who use the provisions of the Uniform Probate Code "as a vehicle to exploit the real client." Close also accused Paoli of abandoning his law practice.

¶19. By Order dated October 20, 1998, the District Court ordered that Close's brief be stricken because it exceeded the 20-page limit without prior leave of court. Close subsequently submitted a redacted reply brief wherein he again accused opposing counsel of making "knowing misrepresentations" to the District Court and acting in a manner "sanctionable and subject to disciplinary action."

¶20.On October 27, 1998, the District Court held a hearing regarding the estate's motion for a protective order and the cross motions for Rule 11 sanctions. The court subsequently issued an order wherein the court determined that the Heirs' request that the estate provide a copy of any documents pertaining to the decedent was vague, overly broad and unduly burdensome. The court also denied the Heirs' request for the production of every inheritance tax return filed by the estate's attorneys in the past five years and the personal logs demonstrating the daily whereabouts of attorney Paoli since June 10, 1997.

¶21.The District Court ordered that the estate deliver to Close copies of any documents Patsy intended to rely on to establish her fee and that the estate produce copies of any documents received or sent to the Heirs since June 10, 1997. The court ordered that the parties disclose to each other the names of any experts they intended to call at the November 25, 1998 hearing regarding the reasonableness of the fees charged.

¶22.In addition, the District Court granted the estate's motion for a protective order regarding the discovery of Brown's law school transcripts, final class rank, and whether any complaints had been lodged against Brown or Knuchel with the Commission on Practice. The court determined that Close's discovery requests were designed to harass and embarrass opposing counsel and needlessly increase the cost of litigation.

¶23.The District Court expressly denied Close's Rule 11 motion finding that the estate's attorneys had not committed fraud upon the court. Instead, the court imposed sanctions against Close for making unfounded, scandalous and ridiculous allegations against the estate's attorneys. The court ordered that the amount of those sanctions would be addressed at the November 25, 1998 hearing.

¶24.Moreover, the District Court admonished Close that his brief "represent[ed] some of the worst of the profession." The court cautioned Close that any briefs or documents filed with the court in the future should "meet at least minimal levels of professionalism and civility" and that he should avoid any further personal attacks on opposing counsel or Patsy.

¶25.Close subsequently filed an Application for Writ of Supervisory Control and Motion for Stay asking this Court to reverse the District Court's orders barring the Heirs' discovery requests, denying Close's request for sanctions against the estate, and imposing sanctions against Close. Prior to a decision by this Court, the District Court entered its Order Ruling on Motions for Accounting and Settlement of Fees. In that order filed on November 17,

1998, the District Court determined that the annuity contract is not insurance proceeds payable upon decedent's death, thus, the Heirs were not devisees under their father's will. The court also determined that since the Heirs were not interested persons as defined by § 72-1-103(25), MCA, they lacked standing to challenge the probate of their father's will, particularly the personal representative's and attorneys' fees. Hence, the court vacated as moot the November 25, 1998 hearing regarding fees.

¶26.On November 24, 1998, this Court denied the Heirs' Application for Writ of Supervisory Control and Motion for Stay determining that, in light of the District Court's November 17, 1998 order, the fee issue was moot. We also determined that, on the issue of sanctions, the Heirs have an adequate remedy by appeal, thus we denied the application for supervisory control on that issue as well.

¶27.The Heirs subsequently appealed the District Court's orders of October 30, 1998, and November 17, 1998.

## Issue 1.

¶28.*Did the District Court err as a matter of law in ruling that annuity contracts are not insurance under Montana law?*

¶29.The Heirs argue that pursuant to this Court's decision in *In re Fligman's Estate* (1942), 113 Mont. 505, 129 P.2d 627, wherein we held that annuity contracts are considered insurance for inheritance tax purposes, it follows that annuity contracts have to be considered insurance for all purposes. The District Court disagreed and, relying on various provisions of Title 33 of the Montana Code Annotated, determined that the annuity contract in this case "shall not be treated as insurance proceeds, but merely as other assets of the estate."

¶30.In *Fligman*, this Court held that the annuity contracts at issue were entitled to the same $50,000 exemption from inheritance tax afforded life insurance. Because we reaffirmed this holding in subsequent cases, *In re Coleman's Estate* (1957), 132 Mont. 339, 317 P.2d 880, and *In re Hammerstrom's Estate* (1958), 133 Mont. 469, 326 P.2d 699, the Heirs argue that our decision in *Fligman* is binding precedent and that we must now determine that the annuity contracts in this case are insurance.

¶31.However, the Heirs fail to recognize that our decision in *Fligman* concerned the

taxation of annuities under regulatory statutes existing since 1942, not the distribution of annuity proceeds under a will. To illustrate its position that annuity contracts are not life insurance merely because they are afforded the same beneficial tax treatment, the estate analogizes that just because the legislature may decide to tax motor vehicles and airplanes the same, does not mean that they are the same. A bequest under a will of decedent's motor vehicle to one individual and decedent's airplane to another, does not mean that either individual could acquire both the motor vehicle and the airplane simply because the two are taxed alike. Upon Charles' death, Putnam/Hartford paid the remaining unspent balance in the annuity to the estate in the same manner as any IRA, bank account, or mutual fund.

¶32.In *NationsBank of North Carolina v. Variable Annuity Life Insurance Co.* (1995), 513 U.S. 251, 115 S.Ct. 810, 130 L.Ed.2d 740, the United States Supreme Court determined that annuities are widely recognized as investment products analogous to bank accounts. The Supreme Court described annuities as follows:

By making an initial payment in exchange for a future income stream, the customer is deferring consumption, setting aside money for retirement, future expenses, or a rainy day. For her, an annuity is like putting money in a bank account, a debt instrument or a mutual fund . . . .

In sum, modern annuities, though more sophisticated than the standard savings bank deposits of old, answer essentially the same need.

*NationsBank, 513 U.S. at 259-60, 115 S.Ct. at 815 (citations omitted). Contrary to the Heirs' contention that the annuity contract is insurance because it was issued by a life insurance company and sold by a life insurance agent, the Supreme Court stated that*

the sale of a product by an insurance company does not inevitably render the product insurance. For example, insurance companies have long offered loans on the security of life insurance, . . . but a loan does not thereby become insurance.

*NationsBank, 513 U.S. at 261, 115 S.Ct. at 815 (citations omitted).*

¶33.The annuity contract in the present case did not provide any life insurance benefits and did not insure against the risk of an untimely death. The contract simply provided for a refund of the premium or contract value should Charles die before receiving all of his

payments. It did not provide any additional benefits in the event of his death, hence it did not insure against anything.

¶34.IRAs and money market accounts have similar "payable upon death" clauses. Like an annuity, those account balances are refundable upon death. Thus, Charles' IRA and money market investments paid $243,345 to the estate upon his death. If we were to hold that an annuity is life insurance simply because the beneficiary is entitled to the balance when the owner dies, IRAs and money market accounts would also have to be treated as "insurance proceeds payable upon death."

¶35.So too, legal commentators have generally determined that annuities are not insurance:

Ordinarily, it is recognized, even by laymen, that contracts of life insurance and of annuity are distinctly different. . . .

. . . Annuity contracts must, therefore, be recognized as investments rather than as insurance.

1 J. Appleman and J. Appleman, *Insurance Law and Practice* § 84 (1981).

An annuity contract differs materially from an ordinary life insurance contract in that it is payable during the life of the annuitant rather than upon any future contingency, and in many instances it is paid for in a single payment which is not generally regarded as a premium.

19 George J. Couch, *Cyclopedia of Insurance Law* § 81.2 (Ronald A. Anderson & Mark S. Rhodes eds. 2d ed. 1983).

¶36.Furthermore, at the September 2, 1998 hearing on the annuity issue, the estate presented testimony from Larry Eaglin, an individual who had been employed in the insurance industry for 35 years. He testified to the differences between life insurance policies and annuities. Annuities, according to Eaglin, are essentially investment vehicles to store or hold money. There is no death benefit risk involved. Annuities are generally used by investors to accumulate money for retirement, with taxes deferred until the money is withdrawn. Life insurance, on the other hand, is a contract between the parties subject to medical requirements. Life insurance involves a substantial risk to the insurance company, unlike an annuity.

¶37. The Heirs argue that annuity contracts are not investments because they are specifically excluded from the definition of investments under § 30-8-113(2), MCA. The District Court found this argument disingenuous, at best. Section 30-8-113(2), MCA, states that an annuity contract issued by an insurance company is not to be considered an "investment company security." It is a stretch to argue that annuities are not investments because they are not "investment company securities."

¶38. Title 33, Chapter 1, Part 2 of the Montana Code Annotated defines various types of insurance. Annuities, in general, are not defined as insurance, even though it would have been a simple matter for the legislature to include a statement defining annuities as insurance if it had so intended. Nonetheless, the Heirs argue that § 33-1-205, MCA, could be read to include annuities. However, § 33-1-205, MCA, states only that some types of insurance may fit more than one definition within the code.

¶39. Life insurance is defined in Title 33, Chapter 1 as:

Life insurance, including credit life insurance, is *insurance on human lives*. The transaction of life insurance includes the granting of endowment benefits, additional benefits in event of death or dismemberment by accident or accidental means, additional benefits in event of the insured's disability, benefits that provide reimbursement or payment for long-term home health care or long-term care in a nursing home or other related institution, and optional modes of settlement of proceeds of life insurance. Transaction of life insurance does not include workers' compensation insurance.

Section 33-1-208, MCA (emphasis added). In addition, Title 33, Chapter 20, deals specifically with life insurance. Section 33-20-101, MCA, outlines the scope of Chapter 20 and states that it applies to annuities as well as insurance. However, a reading of the entirety of Title 33, Chapter 20, reveals that the parts applying to annuities are separated and delineated from the parts applying to life insurance. As the District Court noted: "Had the legislature wished for annuities and life insurance to be treated exactly the same, it would have so stated."

¶40. Nor can an argument be made that Charles intended that the annuity contract replace his life insurance, thus intending that the proceeds of the annuity be treated as insurance proceeds payable upon death. On the face of the contract, Charles, and the agent for Putnam/Hartford, indicated that the annuity was not purchased to replace a previously existing annuity or life insurance policy.

¶41.Since the annuity contract did not involve indemnification, loss, damage, liability or contingent events, it was an investment, not insurance. Therefore, we hold that the District Court did not err in ruling that annuity contracts are not insurance.

## Issue 2.

¶42.*Did the District Court err as a matter of law in ruling that the decedent's children are not interested persons under § 72-1-103(25), MCA?*

¶43.The District Court, having determined that the annuity contract could not be considered insurance proceeds, concluded that the Heirs were not devisees under their father's will, thus they had no standing to challenge the probate of the will. In making this determination, the court relied on § 72-3-634, MCA, which gives any "interested person" the right to file a motion for review of the compensation of personal representatives and anyone employed by the personal representative, and § 72-1-103(25), MCA, which defines "interested person" as anyone "having a property right in or claim against . . . the estate of a decedent . . . ."

¶44.The Heirs contend that the District Court misinterpreted § 72-1-103(25), MCA, and that, contrary to the District Court's interpretation, the Heirs do not have to have a property right in or claim against the estate to be an "interested person" under the statute. Section 72-1-103(25), MCA, provides, in its entirety:

"Interested person" includes heirs, devisees, children, spouses, creditors, beneficiaries, and any others having a property right in or claim against a trust estate or the estate of a decedent, ward, or protected person. The term also includes persons having priority for appointment as personal representative and other fiduciaries representing interested persons. The meaning as it relates to particular persons may vary from time to time and must be determined according to the particular purposes of and matter involved in any proceeding.

¶45.The Heirs argue that the phrase "any others having a property right in or claim against . . . the estate" should be read as simply another designation of "interested person" similar to heirs or devisees. In other words, the Heirs would have us read the statute as follows:

"Interested person" includes:

(1) heirs;

(2) devisees;

(3) children;

(4) spouses;

(5) creditors;

(6) beneficiaries; and

(7) any others having a property right in or claim against a trust estate or the estate of a decedent, ward, or protected person.

¶46.We find no merit in this argument. Instead, we agree with the District Court that the correct interpretation of the statute is that heirs, devisees, children, spouses, creditors, beneficiaries, and any others, each have to have a property right in or claim against the estate to be considered "interested persons." The Heirs had a claim against the estate only to the extent to which they were entitled to one-half of any insurance proceeds payable to the estate. Since we determined that the annuity contract could not be considered insurance proceeds, the Heirs have no property right in or claim against the estate, thus they are not interested persons and they have no standing to contest fees or to argue the reasonableness of the fees of the personal representative or the estate's attorneys. Section 72-3-634, MCA.

¶47.Moreover, Article II of Charles' will stated that the payment of the expenses of the administration of his estate, including the personal representative's and the attorneys' fees, should first be satisfied from the insurance proceeds payable upon his death. Since we have already determined that there are no insurance proceeds, Patsy will be required to pay the debts and expenses out of other estate assets that rightfully belong to her. Hence, since Patsy will pay any fees charged to the estate, and given that she does not dispute the fees charged, the fee issue is moot. Accordingly, we do not address Issues 3 and 4.

## Issue 5.

¶48.*Did the District Court err as a matter of law in refusing to sanction the estate's*

*attorneys and, instead, sanctioning the Heirs' attorney.*

¶49.On September 9, 1998, Close, the Heirs' attorney, filed a motion for sanctions against the estate's attorneys under Rule 11, M.R.Civ.P. Close contended that the estate's attorneys had knowingly misrepresented provisions of the Insurance Code and presented unwarranted positions of law to the District Court. The estate's attorneys subsequently filed a motion for a protective order and for sanctions against Close under Rules 11 and 26 (g), M.R.Civ.P., arguing that Close's various discovery requests were abusive, harassing and constituted a personal attack upon the estate's attorneys.

¶50.In its October 30, 1998 Order, the District Court denied Close's motion for sanctions against the estate's attorneys and granted the estate's attorneys' motion for sanctions against Close. In its Order, the court stated that Close's discovery requests were not designed to elicit any relevant information, but rather, that they were designed to harass and embarrass opposing counsel and needlessly increase the costs of litigation. The court admonished Close that any further documents filed with the court must meet at least minimal levels of professionalism and civility and that any violation of this order would result in further sanctions.

¶51.The District Court did not impose sanctions at that time, but instead determined that the amount of sanctions would be addressed at the November 25, 1998 hearing that had been scheduled to determine the reasonableness of the personal representative's and attorneys' fees. However, that hearing was vacated after the District Court ruled that the Heirs did not have standing to challenge the fees. Thus, the court has not yet determined what sanctions are appropriate in this case.

¶52.We review a district court's conclusions regarding Rule 11 sanctions for abuse of discretion. *Carl Weissman & Sons v. D & L Thomas Corp.*, 1998 MT 213, ¶ 53, 290 Mont. 433, ¶ 53, 963 P.2d 1263, ¶ 53 (citing *Wise v. Sebena* (1991), 248 Mont. 32, 38, 808 P.2d 494, 498).

¶53.We have previously discussed sanctions under Rule 26(g), M.R.Civ.P., only in the context of *responses* to discovery requests and we determined that an abuse of discretion standard of review was appropriate. *See Fjelstad v. State, through Dept. of Highways* (1994), 267 Mont. 211, 883 P.2d 106; *Jerome v. Pardis* (1989), 240 Mont. 187, 783 P.2d 919. Under Rule 26(g), requests for discovery should be treated no differently than responses to discovery requests. Moreover, since Rule 26(g) contains the same language

as Rule 11 to the effect that the pleading, motion or other paper (under Rule 11) and the request for discovery or response or objection thereto (under Rule 26(g)) may not be "interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," the same standard of review should apply. Therefore, our standard of review of sanctions imposed for discovery requests under Rule 26(g), is whether the district court abused its discretion.

¶54. Having read the discovery requests in question in this case, we agree with the District Court that they were not designed to elicit any relevant information, but rather, were designed to harass and embarrass opposing counsel and needlessly increase the costs of litigation. Accordingly, finding no abuse of discretion, we affirm the District Court's order that sanctions be imposed against Close and we remand to the District Court for a hearing to determine the amount and nature of those sanctions.

¶55. Similarly, we have read the estate's attorneys' brief in which Close contends the estate's attorneys knowingly misrepresented provisions of the Insurance Code and presented unwarranted positions of law to the District Court. We find no merit in this argument and we affirm the District Court's denial of sanctions against the estate's attorneys.

*Sanctions on Appeal*

¶56. Close has been equally as unprofessional in his briefs on appeal as he was in the District Court. On appeal, Close continues his diatribe against Paoli and Brown accusing Paoli of abandoning his law firm and failing to review the work of his associate. Close complains that because this is Brown's first probate, the estate is being overcharged for his services. It is not until Close's Reply Brief on appeal that Close abandons his attempt to discover Brown's academic records and concedes that Brown's quality of work before the District Court and this Court has been adequate. If such has been the case all along, and we have no reason to believe it has not, then Close's requests to discover Brown's academic records were, as the District Court determined, merely an attempt to harass and embarrass opposing counsel. And, rather than Brown overcharging the estate for his services as Close claimed, Close has needlessly increased the costs of litigation by filing discovery requests intended to harass opposing counsel.

¶57. Furthermore, in the Statement of Facts portion of his brief, Close discusses the fact that Charles' companion for the 15 years preceding his death was unprovided for in this

will and that Charles purportedly expressed his intention to execute a new will. Close then points out that Patsy, the sole beneficiary under this will, was a long time employee of the bank at which Charles had his safety deposit box, implying that some impropriety may have occurred if indeed a new will had been executed.

¶58.Close also attacks the District Court Judge by sarcastically calling Judge Swandal's interpretation of the term "interested person" in § 72-1-103(25), MCA, the "Swandel Code." And, to add insult to injury, Close misspells the Judge's name. Moreover, Close accuses Judge Swandal of improperly having an *ex parte* communication with opposing counsel. Close made this allegation after he saw opposing counsel enter the courtroom from a door which Close wrongly assumed led to the Judge's chambers. Close originally made this allegation before the District Court at the October 27, 1998 hearing. As the transcript of that hearing reflects, Close did not check his facts before accusing the Judge and opposing counsel of wrongdoing:

MR. CLOSE: . . . Well, I assumed that was your office, Your Honor. I have never been back there.

THE COURT: And that says it all, Mr. Close. You have never been back there, and yet you wanted to make some accusations on the record which were totally false; is that correct?

MR. CLOSE: I don't know the layout of your office, sir.

¶59.Later, in his reply brief before this Court, Close, with no indication that he has checked on the veracity of his allegations, once again charges that Judge Swandal and the estate's attorneys illicitly met in chambers prior to the hearing. In response, Judge Swandal and his law clerk, after being provided with a copy of Close's reply brief by opposing counsel, felt compelled to file affidavits with this Court explaining the layout of the court and of the Judge's chambers and denying that any *ex parte* communication occurred. Close subsequently filed a motion to strike theses affidavits arguing that the record of appeal closed some months ago and that neither the Judge nor his clerk are parties to this appeal.

¶60.In short, Close's briefs are some of the worst we have read in terms of being uncivil and demeaning toward the District Court, the personal representative, and opposing counsel. This style of practice is wholly unprofessional and is unworthy of any lawyer admitted to practice in this State. More to the point, an attorney who engages in this sort of

behavior is not properly representing his client. He brings public discredit to the legal profession. He wastes the time and resources of the courts, of opposing counsel and of the parties.

¶61.The State Bar of Montana (the Bar) has adopted "Standards of Professional Courtesy Among Attorneys" and "Standards of Professional Courtesy and Ethics Between the Judiciary and Attorneys." Both are listed in the Lawyers' Deskbook and Directory published by the Bar. The Standards of Professional Courtesy Among Attorneys, require among other things, that attorneys

remember a dispute is between the parties and not between the attorneys. Effective representation does not require antagonistic behavior.

refrain from making and . . . not tolerate derogatory comments or personal attacks upon other attorneys, their clients, or the judiciary.

Close would do well to commit these precepts to memory. He must understand that professionalism, civility and zealous advocacy are not mutually exclusive concepts.

¶62.Close richly deserves to be sanctioned by this Court for his unprofessional comments and attacks in his briefs on appeal. However, our ability to impose sanctions on appeal in a civil case stems from Rule 32, M.R.App.P. Under that rule, damages may be awarded if this Court is satisfied from the record and the presentation of the appeal in a civil case that the same was taken without substantial or reasonable grounds, such damages may be assessed on determination thereof as under the circumstances are deemed proper.

Because there were substantial and reasonable grounds for portions of Close's appeal, we are unable to sanction him under Rule 32, M.R.App.P. Nevertheless, if there were a Rule of Appellate Procedure that allowed us to sanction Close for his unprofessional and uncivil conduct on appeal, we would make full use of that rule in this case.

¶63.Affirmed and remanded to the District Court for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER